**PURE OIL CO. v. GEOTECHNICAL CORP. OF DELAWARE.**

No. 1442.

United States District Court, E. D. Louisiana, New Orleans Division.

Jan. 5, 1951.

Deutsch, Kerrigan & Stiles, New Orleans, La., for libelant.

John May, Kelleher, Hurley & Kohlmeyer, M. C. Scharff and E. E. Talbot, New Orleans, La., for respondent.

John D., M. A. & Edwin H. Grace, New Orleans, La., for intervening libelants.

WRIGHT, District Judge.

An explosion aboard the M. V. Leo Huff destroyed the vessel and killed three persons on board. The cause of the explosion and the responsibility therefor are sought to be established by this litigation.

The Leo Huff, a former United States Navy Mine Sweeper of wooden construction, had been converted by her owner, the libelant Pure Oil Company, into a shooting vessel to be used in geophysical work in the Gulf of Mexico by the respondent, Geotechnical Corporation of Delaware, pursuant to a contract entered into between the parties. Under the contract the Pure Oil Company was to supply the navigating

crew of the vessel and the respondent was to provide the geophysical crew.

Libelant installed in the vessel for use by the respondent a dynamite magazine of five tons capacity and a detonator cap magazine of five hundred cap capacity. Also installed on the Huff was a dog house which housed a magneto type blasting box and a two-way radio system together with wet cell batteries used to furnish power for the system. The equipment in the dog house was installed by and belonged to respondent. The after bulkhead of the dog house was located approximately seven feet forward of the forward hatch cover of the dynamite magazine, and the dynamite magazine was located seven to fifteen feet forward of the stern of the vessel, slightly to starboard. Libelant also constructed a reel which respondent installed on the vessel four to five feet forward of the stern rail on the starboard side. This reel was powered by a one horsepower 115 volt direct current electric motor, and was used to haul in the dynamite shooting line.

On December 5, 1947, the day of the explosion, the Leo Huff in company with the Nell and G, another shooting vessel, the Nolan R, a recording vessel, and the Mel, aboard which was the respondent's administrative staff and acting party chief who was in charge of the geophysical portion of the operation, departed Cameron, Louisiana, for the day's shooting.

At appropriate spots in the Gulf of Mexico more than a marine league from shore between two marker buoys 19,000 feet apart, respondent placed shooting buoys at intervals of 1,000 feet. The Nell and G was the lead vessel followed in line by the Nolan R and the Leo Huff. The Mel stood off at some distance to watch the shooting operation. As each shooting vessel came alongside a shooting buoy a dynamite charge would be dropped overboard. The charge as prepared by the shooting crew was composed of two sticks of dynamite weighing a total of 33⅓ pounds into one of which was inserted a blasting cap. The two sticks of dynamite were bound together by the lead wire to the blasting cap which wire was in turn affixed to the free end of the shooting line, the other end of the shooting line being attached to the blaster in the dog house. There was also attached to each charge an inflated cellophane bag which served to support the charge at a depth of six feet and as a marker.

After dropping the charge the vessel would proceed approximately five hundred feet paying out the shooting line as she went and wait instructions from the recording vessel. Communication between the shooter on the shooting vessel and the observer on the recording vessel was had by means of the two-way radio. On receipt of instructions and after a three count the transmitter on the shooting vessel was switched off and the charge was detonated. The effect of the shooting was recorded by the use of photographic equipment on the recording vessel.

On the day of the explosion the Leo Huff had a navigating crew of three, all employees of the libelant, and a shooting crew of three, all employees of the respondent. The shooting crew was composed of a shooter, assistant shooter, and line operator. The navigating crew of the Huff survived the explosion but no member of the shooting crew was ever found.

The shooting on the fateful day proceeded without incident except that the shooting reel on the Huff failed to operate on one of the earlier shots and a hand shooting line was put into operation. It appears, however, at the time of the explosion the reel shooting line was again being used.

In accordance with their practice, on the morning of December 5th, the shooting crew had taken from the dynamite magazine and piled on the port side of the Huff near her stern 950 pounds of dynamite, approximately enough for the day's contemplated shooting. When the explosion occurred, approximately 400 pounds were still on deck.

At the time of the explosion all members of the navigating crew were in the forward part of the vessel. The shooting crew was deployed as follows: the shooter was in the dog house, the line operator was on the stern of the vessel apparently watching a

charge which had been placed overboard from the Huff at an appropriate spot alongside one of the shooting buoys, and Lawrence A. Pizzo, the assistant shooter, whose personal representative is the intervenor herein, was preparing or had prepared in the manner above described the next charge to be used. The shooter had received his instructions from the observer, the three count had been given and the explosion which destroyed the vessel occurred at exactly the same second the dynamite dropped overboard alongside the shooting buoy should have been detonated. No witness testified to seeing an explosion near the shooting buoy and the picture of the explosion which was to have taken place there was not developed by respondent's personnel on the recording vessel, apparently because of the explosion on the Huff.

The libelant seeking recovery for loss of the vessel contends that the explosion was caused by the negligence of the respondent who controlled the shooting operation and that the doctrine of res ipsa loquitur applies. The respondent denies the application of the doctrine of res ipsa loquitur for the reason that the shooting operation while primarily controlled by respondent was participated in by the navigating crew of the vessel which was furnished by the libelant. Respondent contends further that assuming res ipsa loquitur does apply, it is not libel because the evidence shows that it was free from negligence and a very plausible explanation of the cause of the explosion was the firing of the blasting cap in the charge being prepared by Pizzo by induced currents of electricity from the radio transmitter in the dog house. Respondent avers that at the time of this accident in December 1947 the possibility of firing a blasting cap by induced currents from a radio transmitter was not known to the industry, and consequently respondent was under no obligation to provide a safeguard against such currents. Respondent also contends that in addition to the written contract under which the geophysical work was being performed the parties entered into an oral agreement which provided for a mutual release of liability for loss or damage to equipment used in the venture. The evidence, however, fails to show any such agreement was entered into.

The evidence preponderates to the effect that the explosion which destroyed the Huff and intervenor's son, Pizzo, resulted from one of two causes, namely, the charge, which had been dropped alongside the shooting buoy and which was intended to be detonated there, was actually under the Huff when it was fired, or the charge being prepared by Pizzo was detonated in some way at the exact time the first charge should have been fired. In either event the detonation of the charge possibly resulted in the detonation of the dynamite which had been piled on deck. The location of the damage to the Huff would so indicate. However, its extent would seem to be considerably less than would normally be expected from four hundred pounds of dynamite.

Whichever alternative is adopted whether it be the dropped charge or the Pizzo charge, the negligence of respondent or of its employees was at least a concurring cause of the explosion. If it is assumed that the dropped charge being detonated under the vessel caused the damage, then it follows that respondent's crew which controlled the shooting operation failed to see what it should have seen, i. e., that the charge was under the vessel and not alongside the shooting buoy when the order to fire was given by the observer and executed by the shooter on the Huff. Such negligence would be more than sufficient to fix responsibility for the explosion on respondent for one who handles explosives is held to the highest degree of care. Continental Insurance Co. v. Harrison County, Mississippi, 5 Cir., 153 F.2d 671.

If the second alternative is adopted, the respondent fares no better than under the first. If it be assumed that the charge Pizzo was preparing detonated and caused the explosion, and respondent strongly urges this possibility, then respondent is faced with the testimony of its own employees and its own instructions to its employees. Respondent's employees testified that making up a charge in advance as

Pizzo was doing is a very dangerous practice and respondent's instructions to employees specifically provided against it. This charge of negligence is not answered by saying that in order to meet respondent's shooting schedule, making up a charge in advance was necessary. Further, there is no evidence in the record to show the schedule could not have been changed to provide more time between shots.

Respondent relies on the possibility that induced currents of electricity from the radio transmitter detonated the Pizzo charge, and that since the industry was unaware such currents could fire a blasting cap and thus detonate the dynamite to which it is attached, there can be no liability as to it. This argument overlooks respondent's negligence in preparing a charge prior to the time it is to be tied into the shooting line and dropped overboard. A blasting cap can be detonated in many ways and having on a vessel dynamite into which has been inserted a blasting cap constitutes a continuing danger to that vessel and every one on board. It matters not that the Pizzo charge may have been set off by induced currents of electricity from the radio transmitter or any other source, or that Pizzo may have inadvertently allowed the lead wire to the cap inserted in the dynamite to come in contact with the reel firing circuit or the hand firing line. The fact remains that if the Pizzo charge had not been prepared in advance it would not have been detonated in advance and respondent must bear the responsibility for this possible cause of the explosion.

■ The only charge of negligence against the libelant which respondent seriously urges relates to the dynamite on the deck of the Huff at the time of the explosion. Respondent shows that the damage to the Huff was concentrated in the after part of the vessel, more to port than to starboard, covering the general area where the deck dynamite was. Respondent shows further that Revised Statutes 4472[1] as amended, and the regulations promulgated pursuant thereto, require magazine stor-

age for dynamite. In view of the ruling in The Pennsylvania[2] this would seem to be a serious charge of negligence. However, the presumption applied in The Pennsylvania does not apply here for two reasons. In the first place respondent, not libelant, placed the dynamite on deck for its own convenience. Libelant provided approved magazine storage for dynamite and when the Huff departed Cameron on the morning of the explosion the dynamite was properly stowed in the magazine. Secondly, the regulations regarding dynamite storage obviously were not intended to cover dynamite actually being used in a day's geophysical shooting operation. Apparently even respondent must have had some doubt about the matter, otherwise the Coast Guard Inspection Officer would have been examined concerning it while he was on the stand as respondent's witness.

■ Respondent suggests also that in view of the limitation of liability proceeding filed by libelant in the United States District Court for the Western District of Louisiana, libelant has surrendered to the trustee in the limitation proceeding any claim it may have against respondent for damage to the Huff. There is nothing in this record to indicate the status of the limitation proceeding. It appears conceded, however, that the libelant has brought a limitation proceeding and has filed therein a stipulation covering its interest in the Huff. If such is the state of the record in the limitation proceeding, then libelant is the proper party to bring this action, having to account in the limitation proceeding for any recovery realized herein. United States Code Annotated, Title 46, Section 185, provides two methods by which a vessel owner seeking limitation may proceed. He may deposit with the court a sum equal to the amount of value of the interest of the owner in the vessel, or give security therefor; or he may transfer his interest in the vessel to a trustee appointed by the court. Under the former procedure the vessel owner retains his interest in the vessel, including any right of action for

1. 46 U.S.C.A. § 170.

2. The Pennsylvania, 19 Wall. 125, 86 U. S. 125, 22 L.Ed. 148.

tortious destruction thereof. Under the latter he is divested of any and all interest in the vessel. The vessel owner herein, the Pure Oil Company, apparently has chosen to proceed in the limitation proceeding under the first alternative and consequently it has retained its right of action for tortious destruction of the vessel.

The claim of the intervenor and personal representative of Pizzo against respondent stands in a different position from that of the libelant. The entire shooting operation was under respondent's control. Libelant had no responsibility therefor. It had contracted with respondent to do the work. Pizzo, on the other hand, was an employee of respondent actively engaged in the operation which took his own life. Whereas the respondent cannot defend itself against the claim of libelant by urging the negligence of its employee, the negligence of the employee can be urged against his claim. Intervenor brings his claim under the Jones Act[3] and the Death on the High Seas Act[4], and it is true that under both acts contributory negligence does not bar recovery. However, where, as here, it is impossible to establish the exact cause of the explosion, it becomes impossible to apply the law of comparative negligence, particularly where the doctrine of res ipsa loquitur does not apply and that doctrine cannot apply to the Pizzo claim. Asprodites v. Standard Fruit & Steamship Co., 5 Cir., 108 F.2d 728.

Under the circumstances of this case it may well be that Pizzo's negligence alone caused the explosion. Certainly this would be true if the charge he was preparing in advance was detonated. It may be that after preparing the charge in advance Pizzo may have allowed the lead wires to the blasting cap to come in contact with the reel, or he may have attached his charge to the hand shooting line while the hand shooting line was still attached to the blaster. Further, if it is assumed that the explosion occurred when the first charge was detonated under the vessel instead of at the shooting buoy it may be that it was Pizzo's job to watch the marker on the charge to see that it was in the proper place when fired by the shooter. There are any number of possible situations under which Pizzo's negligence alone could have caused the explosion and since the doctrine of res ipsa loquitur does not apply to his claim, intervenor must establish his basis for recovery before recovery can be had. He has not done so.

Interlocutory decrees will be prepared in accordance with this opinion.