**GEOTECHNICAL CORP. OF DELAWARE v. PURE OIL CO.**

**PIZZO v. GEOTECHNICAL CORP. OF DELAWARE.**

No. 13621.

United States Court of Appeals
Fifth Circuit.

April 15, 1952.

Rehearings Denied June 3, 1952.

Charles Kohlmeyer, Jr., John May, New Orleans, La., for appellant.

Harry F. Stiles, Jr., Edwin H. Grace, New Orleans, La., for appellee.

Before SIBLEY, RUSSELL and RIVES, Circuit Judges.

SIBLEY, Circuit Judge.

The Pure Oil Company, which for brevity will be called Pure, brought a libel *in personam* against Geotechnical Corporation of Delaware, referred to as "Geotech", to recover for the loss of Pure's motor vessel Leo Huff while in use by Geotech in seismographic blasting operations in search of oil deposits off the coast of Louisiana in the Gulf of Mexico. Negligence on the part of employees of Geotech in exploding a charge of dynamite which sank the Huff is asserted. Geotech denies negligence; and specially claims that Pure parted with any right of recovery it might have had by filing a proceeding to limit its own liability on claims against Pure arising out of the explosion; that there was a parol contract of mutual release of liability for loss of or damage to equipment of each other in the work; and that Pure was violating the law in having dynamite on the deck of the Huff, and this fault contributed to the loss and defeats recovery. The administrator of Lawrence Adam Pizzo intervened, over objection, to assert a claim against Geotech under the Jones Act, 46 U.S.C.A. § 688, or Death on the High Seas Act, 46 U.S.C.A. § 761 et seq., for the negligent killing of Pizzo, employee of Geotech who was aiding in the blasting. An interlocutory decree was rendered in favor of Pure, damages to be fixed later, and Geotech appeals. A recovery was denied for the killing of Pizzo and his administrator also appeals.

The evidence produced, the contentions of the parties, and the application of the evidence to them, are well stated and discussed by the trial judge in an opinion reported in Pure Oil Company v. Geotechnical Corporation of Delaware, D.C., 94 F.Supp. 866. We shall discuss mainly the questions of law and our view of the results of the evidence.

### 1. Pure's Petition for Limitation of Liability.

The Huff was sunk on December 5, 1947 and this libel *in personam* was filed on April 28, 1948. On October 20, 1950, libelant filed an amended libel, and in it alleged that there was pending in the Western District of Louisiana its petition as owner of the Huff for limitation of liability as to claims of four named persons aggregating $120,000, growing out of the explosion; that Pure was without fault, and Geotech was at fault, and if a recovery should be had against Pure, Pure should have a recovery over against Geotech as part of the damages recoverable in this libel. Geotech answered denying liability, claiming laches, and that prejudice had occurred to its insurance by the delay.

No evidence was offered by either party touching the limitation of liability proceeding or any claim involved in it, nor does the interlocutory decree adjudge anything about it. Nothing would require our attention, but that Geotech makes the broad contention that Pure, by filing the limitation petition, has cut itself off from prosecuting the original libel, and that only a trustee appointed by the court in the Western District could now recover for loss of or injury to the Huff, because such a claim is part of the ship to be surrendered in the limitation proceeding. The trial judge in his opinion in this case says: "There is nothing in this record to indicate the status of the limitation proceeding. It appears however conceded that the libelant has brought a limitation proceeding and has filed therein a stipulation covering its interest in the Huff." On that basis he held that libelant could properly maintain its libel, having to account in the limitation proceeding for any recovery.

■ We hold that the original libel did not abate by the filing by libelant of a proceeding to limit its liability to others. The right to limit liability is a statutory right a hundred years old, 46 U.S.C.A. § 183, originating in the Act of March 3, 1851. As the procedure now stands under the amending Act of June 5, 1936, 46 U.S.C.A. § 185, the vessel owner seeking to assert it shall:

(a) deposit with the court for the benefit of claimants a sum equal to the amount or value of the interest of such owner in the vessel and freight, or approved security therefor, and in addition such sums, or approved security therefor, as the court from time to time may fix as necessary to carry out the provisions of Section 183; or (b) *at his option* shall transfer for the benefit of claimants to a trustee to be appointed by the court his interest in the vessel * * *. Admiralty Rule 51, 28 U.S.C.A. prescribes the same thing in more detail. The option is thus given the owner to give a stipulation and keep the vessel and freight and all claims therefor, or to have a trustee appointed and transfer them to the trustee. If the stipulation is given there is no trustee and no transfer to him of anything. It is conceded that Pure's claim against Geotech is a part of the vessel to be covered by stipulation or transfer. O'Brien v. Miller, 168 U.S. 287, 18 S.Ct. 140, 42 L.Ed. 469; Navigazione Libera Triestina, D.C., 34 F.2d 150; The Bleakley, D.C., 56 F.2d 1037. The trial judge says it was conceded before him that a stipulation was given by Pure. That concession has not been withdrawn before us, and no evidence produced that such is not the case. If the stipulation given did not cover this claim, it can be made to cover it at any time by the express language of Section 185. This is a matter for the limitation court and the claimants there. Geotech, having the burden to prove that this libel ought to abate, does not show it by the bare fact that a limitation proceeding has been filed. So far as we know there has been no trustee appointed and no transfer to him of anything, the ship owner having given a stipulation under the statute. Pure is still the owner of this claim against Geotech, and may prosecute it.

### 2. The Contract Involved.

■ The seismographic work over water was undertaken under an elaborate written contract of 18 printed pages formally executed by officers of the two corporations "as of the 1st day of January, 1947", though actually signed the latter part of January. It had been formulated by a rep-

resentative of each company, not officers having authority to sign contracts, and adopted with little if any change by the officers. Geotech claims that while it was under consideration the question of possible injury to or loss of the equipment came up between the two formulators, and that they agreed there should be a mutual waiver of responsibility, the one to the other, therefor. The representative of the Pure denies that any agreement was made by him to such an addition to the proposed contract, and there is uncontradicted evidence that he had no authority to sign a contract; and the trial judge held that no addition to the written contract, or any side contract to the effect claimed, was in fact made. We agree. But the same result may be reached by the parol evidence rule in reference to written contracts. All negotiations prior to the execution of the written contract by persons authorized to contract, which are not embodied in it or shown to have been omitted by fraud, accident or mistake, are merged in the writing—it alone speaks the agreement.

██ Again it is to be noted that it was not the contract of January 1, 1947 that was in force at the time of the explosion, with whatever additions or changes which may have been made by parol. That contract ran by its terms only till July 1, 1947, but might, at the option of Pure, be extended for an additional six months commencing July 1, 1947, on written notice given sixty days before. The contract was duly renewed by a writing signed by an officer of Pure. It refers to the "Written agreement between Pure Oil Co. and you, executed as of Jan. 1, 1947", and to its "option to renew and extend it for six months", proposed to be exercised, and concludes: "This letter, when accepted by you at the point indicated below, will further evidence our agreement that the compensation to be paid you during the term of said renewal period shall be the same, and the *other terms* and *conditions* of *said written agreement* shall continue as in *said written agreement provided*". This letter was signed in duplicate: "Accepted and agreed to by Geotechnical Corporation of Delaware, by Roland F. Beer, President",

who had also signed the contract of January 1, 1947. This adopted the terms and provision in "said written agreement provided" and not parol additions if there were any. There is nothing in this contract to prevent recovery by either party from the other for the negligence of the other. On the contrary there is an agreement that "Contractor (Geotech) obligates itself to save Pure harmless from liability on account of acts of negligence or wilful misconduct on the part of contractor's employees * * * except that such liability on the part of the contractor shall not exist when such damages, injury or death result from Pure's negligence". This but says what the law would say.

The effect of the whole contract is to make Geotech an independent contractor having its own employees and equipment to do technical work on land and water, to secure in its own way desired results. Pure was to furnish certain supplies, especially explosives, selected by Geotech but paid for by Pure, and in marine work Pure was to furnish a vessel equipped to carry explosives and a navigating crew only, all under the control of Geotech in accomplishing its work. Geotech had three other vessels furnished by itself, used in superintendence and observation, and in dynamiting. We find nothing to absolve Geotech from liability for negligence in the use of the vessel of Pure.

### 3. The Federal Law Touching Explosives on Shipboard.

██ It is contended that the master of the Huff knew that dynamite was carried on deck habitually during the shooting, outside the magazine provided for it and contrary to law, and that for that reason Pure cannot recover; 46 U.S.C.A. § 170; or at least there is a presumption that this violation was a cause, if not the sole cause, of the explosion, under the decision in The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148. Subsection (5) of Section 170 appears to be the prohibition applicable here, relating to "any vessel other than a passenger-carrying vessel"; but it says, "except as permitted by the regulations of the Commandant of the Coast Guard established

hereunder". The Regulations in the record embrace 370 pages which we find difficulty in applying here, but we assume are understood by the Coast Guard. On September 4, 1947, Pure applied to the Coast Guard for a permit to use the Huff in the contemplated work. She was inspected and reported properly equipped for carrying explosives in maximum quantities not to exceed five tons of dynamite and 500 detonator caps, the dynamite to be stored in a magazine provided for that purpose and the caps in a separate magazine in the forward part of the vessel. Pure provided the magazine for the dynamite as required in the stern part of the ship, and one for the caps in the forward part. The vessel was again inspected and a formal permit issued on a printed form, good till March 23, 1948, to carry the specified explosives "for seismograph explorations in the Gulf of Mexico". The vessel and navigating crew were then turned over to Geotech for use under the contract, and she was so used beginning October 2nd.

On December 1st, before the explosion, Geotech's men loaded five tons of dynamite into the magazine provided therefor, the navigating crew taking no part. The vessel left port with the hatch over the magazine closed and no dynamite on deck. Before beginning to shoot Geotech's men took out, according to their custom, enough dynamite for the contemplated shooting, testified to be about 950 pounds, and placed it on deck along the port rail near the stern. This had been used up except an estimated 430 pounds when the explosion occurred. The navigating crew had nothing to do with handling it. The claim is that the master should have prevented taking so much out, but it seems to us that the shooting crew of Geotech were in charge and the proper judges of how much should be taken out to carry on the "seismograph exploration operations" which the Coast Guard had authorized the Huff to carry on. Each blast used at first 50 pounds, later 33⅓ pounds of dynamite, and they were being fired every three or four minutes. We think no breach of the statute or permit was shown. If there was a breach how-

ever, Geotech and not Pure was the active law breaker. The statute indeed in Section 170(5) makes it unlawful for anyone "knowingly to * * * carry * * * or use on board any vessel" an unpermitted explosive, and subparagraph (7) (b) more specifically provides that the law applies both to the owners and master of vessels "and upon all other persons" doing the prohibited things. We do not think that Geotech is in any position to charge against Pure as a statutory fault its own conduct. And the presumptions asserted in The Pennsylvania would work as strongly against Geotech as Pure, if applicable at all, which we doubt.

██ It is further urged that after the Coast Guard permit was issued a gasoline powered generator was installed on the rear deck of the Huff to recharge the wet cell batteries used in the shooting; and an official of the Coast Guard, but not the one which issued the permit, testified he would not have classified the vessel as satisfactory for explosives if he had known of it. This testimony does not invalidate the permit which was issued. And again it is to be noted that the generator was owned by Geotech and installed by it. Geotech is not in position to charge the installation against Pure as a fault of the latter in this private suit between them.

4. Responsibility for the Explosion.

The Huff was a wooden vessel 90 feet long, built for the United States for use as a mine sweeper. Her shooting crew had been shooting charges for almost an hour on December 5, 1947, at intervals of space of 500 feet along a marked shooting line, and of time of 3 to 4 minutes. The navigating crew were in the forward part, in the pilot house and galley. The shooting crew were in the stern part, three in number. The chief shooter was in the "dog house" installed by Geotech on the deck to the rear of the cabin. It was an enclosed room, with small windows, in which were the wet batteries which furnished current for a two-way radio transmitter also there, by means of which the shooters were in communication with the observation boat some

distance away, in which an observer timed the shots, and by photography recorded the results. The "dog house" also communicated by loud speaker with the pilot house, to control the movements and speed of the vessel. The switch which controlled the current which worked the radio and cut it out from that use and transferred it to the shooting circuit to explode the cap and attached dynamite when so ordered from the observation boat, was also in the "dog house". The magazine was further aft and under deck, covered by a hatch and separated from the ship's sides by an air space all around of three and a half feet. It had about four and a half tons of dynamite in it at the time of the explosion. It was to the rear of the "dog house", but beyond the hatch there was a deck space between the hatch and the stern rail in which the assistant shooter, Pizzo, and the third man worked. Pizzo prepared the charges for shooting by inserting a cap in a stick of dynamite and tieing this stick to another stick without a cap, using the wires which led from the cap to be connected into the firing circuit. The charge when prepared was put into a white cellophane water-tight bag, and by the third man put over the stern into the water, the bag serving to float it at a depth of six feet, while the bag projected above the surface and served as a marker to locate the charge. The Huff, being under way, would proceed about five hundred feet, the firing line being paid out either by hand, or by a reel on the starboard side near the stern. There were two lines in use, the reel line having failed to fire its charge shortly before. These three men were all killed by the explosion and no one can say certainly what each did to cause it. Very shortly before it the ship's cook went back and announced that coffee was ready, and the chief shooter said they would be in directly. The cook saw the magazine cover closed, the hand line coiled on the hatch, dynamite piled on the deck nearby, against the port rail. He saw Pizzo standing there looping two sticks of dynamite together with a wire running from the cap. The third man was on the starboard side paying out over the stern

rail the shooting line from the reel, which was running. The cap wire of Pizzo's charge was coming up from the deck, moving loosely. The cook heard a radio order given, "Go ahead and shoot", as he neared the deck house, and he was then knocked unconscious. Another witness who was on the Huff and survived was an employee of the Louisiana Conservation Commission, observing the effect of the shooting on marine life. He says there was no dynamite on deck when they left port, but the shooting crew took some from the magazine and stacked it on deck when they got to the firing line. He observed two unsuccessful efforts to fire a charge with the reel line, and that a change was made to the hand line. He was on the starboard side forward when the explosion happened. The master and the remaining crew members were in the pilot house. They say the ship's engine was not running at the time of the explosion, and the ship sank by the stern almost immediately. The observer in the observation boat also tells of the trouble with the reel line. He tells us that on the last shot when the Huff got her distance the chief shooter radioed he was ready, and the observer gave the order to fire. The chief shooter then, according to his custom, counted slowly one, two, three and cut out the radio, and after what would have been the count four, he would have thrown the firing switch. This time at the very second that the firing switch should have been thrown the explosion occurred. No one noticed whether the charge in the water exploded, and the photograph which should have showed, was never developed. A witness in another observation boat was looking at the Huff, and he says the explosion seemed to him to be on her rear deck. A diver, with rough waves interfering, looked the wreck over, and found the ship intact forward of the "dog house", and the deck and side planking in place back to the stern on the starboard side, but on the port side deck and side planking gone, and also that side of the magazine. The propeller was in place on the shaft and seemingly unharmed, and the timber above the shaft was in place. He saw no dynamite. Much

expert opinion was expressed as to the possible or probable causes of the explosion, but in considerable disagreement.

■ The doctrine of *res ipsa loquitur* is invoked by Pure. There is evidence that hundreds of shots had been recently made from the Huff by the same men and with the same equipment in safety. It is clear that the operation and the equipment were wholly in charge of Geotech, and Pure and its employees did nothing to cause the explosion. It would seem to require an explanation from Geotech under the invoked doctrine. But the doctrine as expounded by the Supreme Court, and to be applied in admiralty, has less potency than is given it in some other courts. It suffices to cite three recent cases: Sweeney v. Erving, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815; Jesionowski v. Boston and Maine R. R., 329 U. S. 452, 67 S.Ct. 401, 91 L.Ed. 416; Johnson v. United States, 333 U.S. 46, 68 S.Ct. 391, 92 L.Ed. 468, the last a suit in admiralty. The effect of them is to hold that the doctrine is not a rule of law, but a principle of evidence, useful to aid in making a *prima facie* case, but that it does not change ultimately the burden of proof on the plaintiff to show negligence in the defendant; and when the evidence is all in, the question still is whether all the evidence, in the light of common experience, reasonably shows that the defendant was negligent in some respect that caused the injury, though the particular negligence cannot be pointed out or directly proved. The question in this case is as stated.

■ We are of opinion that the explosion was not in the magazine, for the credible evidence is that four and a half tons of dynamite exploding would have blown the whole vessel to bits. The explosion was not of the charge in the water, fouled under the stern of the ship by the propeller. The propeller was unharmed, and the explosion was seen on the deck. The shooting line was running out over the stern rail just before, as it should have been. And if it was fouled up under the ship it was negligence in the shooters on the ship and the observer in the boat not to have looked for the white bag and located the charge before exploding it. The observer had to have his camera on this target before ordering to shoot. We think the explosion was of the capped charge of 33⅓ pounds of dynamite in Pizzo's hands, which he had prepared to use three or four minutes later when the charge on the firing line should have been exploded. The credible evidence is that a charge of that size would not have injured the Huff so much, but that it would detonate the other dynamite nearby on the deck, estimated at 430 pounds, and this would have caused the damage done and in the locality where it appeared. In this view two faults appear against Geotech. One is the having so much dynamite on deck. The other and more serious is that Pizzo prepared in advance the highly dangerous combination of dynamite and cap. It is well known that dynamite is not by itself easily exploded at ordinary temperatures, but the matter in the cap is easily set off by heat generated by electricity, or by concussion. The cap exploding sets off the dynamite, and dynamite sets off nearby dynamite, as happens when the two sticks of dynamite in a charge are fired by one cap.

There is room for speculation as to what set off Pizzo's cap and the 33⅓ pounds of dynamite in his hands. One might guess he just dropped it on the edge of the hatch combing. But because it went off at the very second that the chief shooter was to throw, and probably did throw, the shooting switch, the inference is strong that the wires of the cap had come into contact carelessly with the shooting circuit, or the shooting circuit had induced a current in the circuit of the cap without metallic contact. Geotech contends strongly for an induced current, but from the radio transmitter which it is now known can fire a cap; but that because this was unknown in December, 1947, it cannot be negligence not to have guarded against it. The experts say that for radio emanations to set off a cap, much depends on the power of the radio and the nearness of the transmitter to the cap; on the length of the cap wires as compared to the length of the radio wave, and on whether the cap wires are parallel with the antennae of the radio.

206

These conditions, which can be met in experiments, are said not to be likely to occur accidentally—one witness said not once in ten years—and we have no proof that they did here. But if this explanation of the explosion be accepted, there remains the negligence of having unnecessarily prepared this dangerous charge in advance, which several of the shooting crew testify was regarded as intrinsically dangerous. Geotech in fact had prohibited it by a rule promulgated to its crews. This act was the real cause of the tragedy, and is chargeable to Geotech, though it had forbidden it to be done. On the whole case we think negligence appears and that the interlocutory decree in favor of Pure must be affirmed.

### 5. Pizzo's Intervention.

■ Admiralty rules 34 and 42, 28 U.S. C.A. providing for interventions in cases *in rem*, and when a fund is in court for distribution, do not authorize an intervention in a suit *in personam*. There is neither *res* nor fund before this court. It was a convenience to intervenor to take the evidence in his case along with that taken in the main case, but the relationships involved are different, as are the principles of liability and the measure of damages. We doubt the propriety of the intervention over objection. But the two cases, if separately filed, could have been tried together, there being no jury, without confusion. The intervenor in fact simply offered in his behalf the record as made by Pure. We will not dismiss the intervention.

■ But Pizzo's case is not governed by the result of Pure's. There is here no room for *res ipsa loquitur* to have any effect, for the very operation and the very instrumentality which injured Pizzo was in his control. The negligence which we have found attributable to Geotech is that of Pizzo. It is not a question of contributory negligence which would possibly not defeat him, but as we have seen the case, he was solely to blame.

The decree appealed from is as to both appellants affirmed.