**Norma C. GUILLOT, Bobbie Lynn Guillot and Norman Andras, Claimants, Appellants,**

v.

**CENAC TOWING COMPANY, Inc., as Owner of the BARGE MURRAY MAC, Appellee.**

**No. 22281.**

United States Court of Appeals Fifth Circuit.

Sept. 27, 1966.

---

**900**

James J. Morrison, New Orleans, La., for appellants.

John W. Sims, Harry S. Redmon, Jr., New Orleans, La., for appellee.

Before BROWN, BURGER,* and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

To the 4–1–4 riddle of *Jane Smith*[1] this case adds a new wrinkle. Mike Hooks, Inc. v. Pena, 5 Cir., 1963, 313 F.2d 696, 1963 AMC 355. The problem is the imminent collision course between the Louisiana Direct Action Statute, L. R.S. 22:655 and the Federal Limitation of Shipowner's Liability Act, 46 U.S.C.A. § 183 et seq. There the Court, unable to muster a majority for an authoritative ruling on the point at issue, avoided risk of collision by a sort of general prudential[2] acceptance of the swing vote approach of Mr. Justice Clark that the issue be deferred until the limitation proceedings were finished. So prescient was this, that the evil day of decision has now been postponed for twelve years,[3] and if we are right here, it may go on forever as the Great Undecided Problem. Involved specifically there was the question whether a direct action could be maintained against liability insurers of the vessel owner. We do not have that here—leastwise we do not think we have that here.[4] What we have here is the question whether trial of the direct action against the Liability Insurer of the responsible executive *officers* of the corporate Shipowner should in effect be stayed by virtue of the limitation proceeding monition and restraining order.[5] Our answer to that question, not simple, is complex and conditional and taking our fix on *Jane Smith*, we, too, postpone decision

* Of the District of Columbia Circuit, sitting by designation.

1. Maryland Casualty Co. v. Cushing, 1954, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806, 1954 AMC 837.

2. Art. 27, (former 33 U.S.C.A. § 112, now § 1089), 33 U.S.C.A. § 212; Rule 24, 33 U.S.C.A. § 349.

3. To some extent, the problems and issues were ruled on by Judge Ellis in In re Independent Towing Co., Inc., E.D.La., 1965, 242 F.Supp. 950. As with *Jane Smith*, the big issue washed out by settlement thus avoiding appellate review. See 44 Tex.L.Rev. 785 (1966).

4. We have some difficulty in divining just what Appellants claim at times. Reading pleadings, on which this case really rests, we get one picture, but quite an-

other from briefs. It may just be a case of counsel being overpowered by his own figuratives. Of the direct action insurers, he states, they "are dry land * * * liability insurers of officers and stockholders of the owner and repairer, and not a drop of salt water courses through their veins. They, and their assureds, are dry land, swivel-chair sailors at best * * *." Appellant seeks to have them "unmasked [to] appear for what they really are" and to have the injunction modified "so as to drive the coat-tail hanging dry-land insurers out in the open for a blood analysis * * * of the amount of salt water in their veins."

5. The ship repairer and Testing Laboratory and their insurers are entitled to no admiralty injunction.

## I.

The case starts out simple enough. On November 13, 1963, one employee of the Shipyard was killed, another severely injured from an explosion on the Barge MURRAY MAC while these men were engaged in welding hot work.[6] On October 1, 1964, Shipowner timely filed its limitation of liability petition and as had countless others before him, the District Judge entered sheaves of orders where one might do, Pershing Auto Rentals, Inc. v. Gaffney, 5 Cir., 1960, 279 F.2d 546, 548, 1960 AMC 1287. Besides directing the issuance of the monition, approval of the ad interim stipulation for value of the Barge MURRAY MAC, an injunction in traditional but sweeping terms[7] forbade the institution or prosecution of suits or claims in other proceedings against Shipowner, the Barge MURRAY MAC "its agents, representatives and/or insurers, and/or against the Barge MURRAY MAC and/or her underwriters."

Subsequently, on October 26, 1964, the Damage/Injury Claimants (note 6, supra) moved the Admiralty Court to relax the restraining order to enable them to prosecute suits against the Liability Insurers of the Shipowner then filed or to be filed.[8] This motion was in rather

---

6. The cast of characters is:

| | |
|---|---|
| Shipowner | Cenac Towing Company, Inc. |
| President of Shipowner | Ovide Cenac * |
| Vice President of Shipowner | Raleigh Pellegrin * |
| Shipowner's Liability Insurer | Hanover Insurance Company of New York |
| Shipyard | Gretna Machine & Iron Works, Inc. |
| Officers of Shipyard | George A. Peterkin, Jr., et al. |
| Shipyard's Liability Insurer | Hartford Accident & Indemnity Company |
| Testing Laboratory | Ralph S. Holt Testing Laboratory, Inc. |
| Death Claimants | Widow and surviving daughter of Irvin Charles Guillot |
| Injury Claimant | Norman Andras |
| The Vessel | Unmanned Barge MURRAY MAC, Steel Hull, 210′ length, 48′ beam, 10′ 6″ depth, 846 gross tons unmanned tank barge |

* Note: Each now deceased, the direct action suits being against their respective successors.

---

7. By the Injunction it was:

"ORDERED that the filing, commencement, and prosecution of any and all suits, actions or legal proceedings * * * against (1(a)) Petitioner, Cenac Towing Company, Inc., owner or the Barge MURRAY MAC its (b) agents, (c) representatives, (d) and/or insurers, and/or against (2(a)) the Barge MURRAY MAC (b) and/or her underwriters * * * in respect of any claim for loss, damage, injury, death and destruction done * * * by reason of the * * * explosion occurring * * * on November 13, 1963, except in this proceeding, be and they are hereby stayed, restrained, and enjoined until the further hearing and determination of this proceeding and further order of this Court * * *."

8. The motion was apparently triggered by the action of Hanover, Shipowner's Liability Insurer (see note 6, supra), not surprisingly represented in the Louisiana State Court suit previously filed in Orleans Parish by still other and independent counsel that befits these amphibious Donnybrook Fairs. American Fid. & Cas. Co. v. Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co., 5 Cir., 1960, 280 F.2d 453, 455–456. Hanover sought and obtained from the State Court an extension for time to answer on the ground that "until the issue of (Shipowner's) limitation is decided, it is impossible and futile for defendant Hanover Insurance Company to plead herein since the monition has been issued ordering all parties to file in the Federal action any claims for liability."

broad terms claiming that the injunction "purports to, and does, stay and enjoin proceedings * * * and prosecution of suits, against persons not entitled to limit their liability" under 46 U.S.C.A. § 183. It asked that the "injunction issued * * * be recalled, rescinded and set aside * * * insofar as it stays and enjoins proceedings * * * and prosecution of suits, against anyone except Petitioner, Cenac Towing Company, Inc., and the Barge Murray Mac."[9] On submission of the motion, the Shipowner agreed to an increase of the ad interim stipulation to $49,000[10] and by like stipulation of all counsel, the Court relaxed the injunction to permit the filing, but not the prosecution, of the suits to avoid problems of prescription, statute of limitation, etc.[11] The Court denied the relief sought, consequently all parties are therefore on notice that further prosecution of the direct action suits are enjoined at least until further order of the Admiralty Court.

Although the merits of the controversy are not before us, the nature of the occurrence insofar as it bears upon the conduct of the corporate Shipowner and that of its managing officers whose status would charge the Shipowner with privity and knowledge is relevant. As the action of the District Court was based solely on charges and countercharges reflected in the limitation of liability petition and the various State Court and admiralty proceedings, (see note 11, supra) we, too, draw freely on them knowing full well

As we discuss later, one of the problems here is how to make the so-called outsider, the independent liability insurer who is not a party to this proceeding and is not represented by proctors for Shipowner, but which has the full and unlimited benefit of these orders somehow amenable either to the limitation proceedings or bound under familiar principles of collateral estoppel or res judicata.

9. See the order, note 7, supra. Appellant apparently (note 4, supra) now recognizes the injunction to be proper against [1a], [d] *marine* insurers, [2a] and [b]

*marine* underwriters, but not as to [1] [b] [c] [d] *non*-marine insurers, or [2b] *non*-marine underwriters.

10. Originally fixed at $47,900, the increase of $1100 was the outside value of the claim against the Shipyard for the explosion damage to the hull. As pointed out subsequently, we accept the value of $49,000 by rejecting Appellants' contention that the Shipowner must surrender the value of the third party claims seeking indemnity from the Shipyard and Testing Laboratory to the extent Shipowenr is cast for the death and injury claims.

11. Permission to try and prosecute these suits totalling $800,000 for death claims and $550,000 for injury claims is sought by this appeal:

| No. | Date Filed | Court | Plaintiffs | Defendants |
|---|---|---|---|---|
| 425–795 | 7/31/64 | Orleans Parish | Death Claimants | Shipowner, Shipowner Liability Insurer Testing Laboratory |
| 425–795 | 11/31/64 | | | Amended to include as defendants President & Vice President Shipowner, and Executives and Liability Insurer of Shipyard |
| Adm. 6750 | 7/31/64 | E.D.La. | Death Claimants | Shipowner and Barge MURRAY MAC |
| 86–772 | 11/12/64 | Jefferson Parish | Injury and Death Claimants | Shipowner, Shipowner's Liability Insurer, Shipowner's President and Vice President; Officers of Shipyard and its Liability Insurer and Testing Laboratory |

that on a trial or trials, the facts may turn out to be something quite different. The details, however, are not too significant. It suffices that the pleadings in the non-limitation cases (note 11, supra) and the formal answer in the limitation proceeding allege with factual particularity this situation. On a pre-purchase condition survey, the Shipowner found cracks in the after bulkhead separating the cargo tank from the after-rake. Adjacent to the rake were skegs, port and starboard, which were so constructed as to have a number of compartments into which leaking gasoline could drain and be trapped. The means for drainage and ventilation of the skegs were inadequate. The gas-free certificate furnished by the Testing Laboratory covered specifically the numbered tanks and rake tanks and inferentially did not cover the skegs. The Shipowner through its President and Vice President had direct actual knowledge of the leaks of gasoline and the unseaworthiness of the Barge MURRAY MAC in the structure, design, and condition of the skegs.[12] Consequently in allowing the welding to go on, the corporate Shipowner had privity and knowledge of this negligence [13] and unseaworthiness [14] and each of the two executive officers had a personal accountability for the ensuing death and injuries.[15]

In attacking the District Judge's refusal to relax the injunction to permit the active prosecution of the direct action

12. On November 12, 1963 the Barge MURRAY MAC was put on the graving dock of the Shipyard. As it was known that the Barge had long been engaged in the carriage of transportation of bulk cargoes of gasoline, the Barge was first supposedly gas-freed at the Shipyard, and the Testing Laboratory issued a certificate that the Vessel was "safe for men—safe for fire." In the course of the survey, the Shipowner became aware of the existence of cracks in the bottom shell plating at the after rake bulkhead of the No. 4 starboard tank directly above the starboard skeg of the Barge. Apparently the Shipowner also found what appeared to be gasoline leaking from the starboard skeg. As constructed, the Barge had two skegs, port and starboard, at the afterend of the Barge. The skegs were constructed of steel framing with vertical channel members spaced at approximately 2′ intervals. The skeg framing was plated over with steel sheeting. Each skeg therefore consisted of approximately 16 compartments the width of the channel members and in varying lengths and heights. These compartments were neither air tight nor water tight, but were designed to be ventilated or drained by using two threaded plugs fitted at the afterend of each skeg. As designed, the compartments within the skeg below the cargo tanks were to have been filled with concrete, but this was not done. The Shipowner and its President and Vice President having knowledge of these cracks in the bulkheads and the structure of the skegs and the gasoline leaks nevertheless determined to purchase the Barge and thereupon engaged the Shipyard to make the necessary repairs by welding these cracks

without requiring that the skeg compartments be drained of residue gasoline, completely gas-freed, and the safety of hot work thereafter certified by the Testing Laboratory. Because these and other precautionary steps were not taken, when welding commenced on the skeg, there was a violent explosion killing one and severely injuring the other Shipyard employee.

13. Besides other things violations of certain statutes and Coast Guard regulations were charged as to one or more of the tort feasors including 46 U.S.C.A. § 391a, 46 C.F.R. Parts 30 to 39, inclusive, C.G. Reg. 1 through 3; Reg. § 35.01–1. The President and Vice President of Shipowner being "persons in charge" of the Vessel under 46 U.S.C.A. § 391a with personal knowledge of the dangerous and explosive conditions, failed to comply with the requirements of 46 U.S.C.A. § 391a and the Coast Guard regulations.

14. The Barge MURRAY MAC was unseaworthy because of the absence of a valid certificate authorizing hot work, cracks in her hull permitting dangerous, explosive leaks into the starboard skeg, the construction of the skeg permitting leaking gasoline to become trapped with inadequate drainage plugs or ventilating devices, etc.

15. All of these contentions were also brought forward in the formal answer filed by the Damage Claimants in the limitation proceedings which alleged specifically that with the privity and knowledge of the corporate Shipowner, the Barge MURRAY MAC was unseaworthy and the Shipowner was negligent.

cases, the Appellants assert that this is not really controlled by *Jane Smith*, supra. Two principal reasons are assigned, the first is that, unlike *Jane Smith*, the insurance is land-based run-of-the-mill public liability insurance, not marine insurance, and the admiralty jurisdiction is limited to marine insurance as such. The second, perhaps a corollary of the first, is that in *Jane Smith* all of the cases—limitation proceeding and direct action—were in the same Federal District Court so that its injunction came from its reservoir of equitable powers in Civil Actions which are non-existent while the Court sits in admiralty. Granting that there are significant distinctions between this and *Jane Smith*, we find neither of these distinctions to have any merit.

■■ As to the first, *Jane Smith* involved two types of insurance, workmen's compensation with its typical 1(b) employer's liability coverage and traditional shipowner's P&I insurance. Workmen's compensation, with or without the so-called marine endorsement, is about as land-based as can be imagined, as witness the exclusion of such liabilities in a standard P&I policy. But more important, whether the insurance is in the form or trappings of underwriters at Lloyd's Coffee House, Maryland Cas. Co. v. Southern Farm Bureau Cas. Ins. Co., 5 Cir., 1956, 235 F.2d 679, 683, or some domestic or foreign latter day adaptations of it, is quite unessential to the concept underlying *Jane Smith*. Availability of insurance which protects the vessel owner against liabilities arising from his use, ownership or operation of the vessel is a way to protect his interest in the vessel. If so, the Court reasoned, the liability insurance was available to third party damage claimants independent of the limitation proceeding, the shipowner would lose the benefit of the insurance and his vessel as well. Of course the status of the insurance as maritime or non-maritime is completely irrelevant to the question of jurisdiction of the

Admiralty. The Admiralty derives its jurisdiction of the limitation proceeding, not by virtue of the character of the insurance which may be brought into the concursus for resolution, but rather from the nature of the occurrence. The statute has long been construed to embrace maritime as well as non-maritime claims. Just v. Chambers, 1941, 312 U.S. 383, 61 S.Ct. 87, 85 L.Ed. 903; Richardson v. Harmon, 1911, 222 U.S. 96, 32 S.Ct. 27, 56 L.Ed. 110; Gilmore & Black, Admiralty, § 10–1, et seq. pp. 676, 679, n. 45. And certainly this would be true now that admiralty jurisdiction has been extended to damages occasioned by a vessel. 46 U.S.C.A. § 740; Johnson v. Traynor, D.C. Md., 1965, 243 F.Supp. 184. The statute, 46 U.S.C.A. § 185 which contemplates an injunction and the Supreme Court Admiralty Rules,[16] see, e. g. Rule 51, make no distinction as to maritime or non-maritime claims.

■ The Court to whom virtually exclusive responsibility is committed for the operation of this machinery has ample resources to assure, as appropriate, that such Court retains exclusive control and power over competing claimants. And in this day which, to the dismay of some, and the disappointment of many others who see the esoteric trappings of their specialized calling foundering from the forces of integrated rules, it would be odd indeed if the same person sitting as the same Judge were powerless to act because of the abbreviated, and now nearly obsolete, prefix to a cause number. In the Admiralty the Chancellor now goes to sea and has adequate equitable reserves. Swift & Co. Packers v. Compania Colombiana Del Caribe, 1950, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206.

Consequently, as to the direct actions against the insurers of the Shipowner, as such (see note 11, supra) *Jane Smith* directly applies. That does leave open the question of how *far*, or perhaps more accurately, how *long* it is to apply. One can, as the Shipowner here urges, read

---

16. See Supplemental Rule F(3), effective July 1, 1966, in the integrated rules. 39 F.R.D. 69, et seq., 248–251.

it as a deliverance of the law of the Medes and Persians which altereth not (until expressly overruled). Or one can read it as the makeshift improvisation of the moment in the judicial travail of a tribunal unable authoritatively to make up its mind.[17] To that extent it forecasts the possibility of a change with change in the composition of the Court,[18] it is perhaps an open invitation for litigants to importune the Court for decision and as such has scarcely more precedential value than an equally divided Court.[19]

■ Without choosing among these readings, we think that following the practical approach of Tokio Marine and Fire Ins. Co. v. Aetna Casualty & Surety Co., 5 Cir., 1963, 322 F.2d 113, 1964 AMC 308, which affords us considerable latitude in devising practical solutions to avoid or lessen judicial administrative conflicts, and Pershing Auto Rentals, Inc. v. Gaffney, 5 Cir. 1960, 279 F.2d 546, to afford a concursus in a multiple-claim-inadequate-fund-case, it is appropriate for us to pursue the *Jane Smith* course. That means that as to the direct action against the insurers of the Shipowner as such, the injunction was proper and the trial thereof must be stayed until disposition of the limitation proceedings.

■ But the case is much more difficult as to the direct actions against the two executive officers and the liability insurer with respect to such officers. The Damage Claimants have a twin-screw approach. First, they urge with literal accuracy, the statute accords its protection only to the owner (or bareboat charterer) of the vessel, 46 U.S.C.A. §§ 185, 186, Adm.Rule 51 [20] not to the officers of a corporate shipowner. Second, they argue, the statute expressly leaves open for unlimited liability all claims " * * * against the master, *officers,* or seamen * * *," [21] 46 U.S.C.A. § 187. The latter (second) contention is easily disposed of. The term "officers" obviously refers to officers who are a part of the crew of the offend-

---

**17.** See 44 Tex.L.Rev. 785, n. 19 (1966), Gilmore & Black, Admiralty, n. 7, § 10–31.

**18.** Since 1954 and the 4–1–4 decision of the Justice Frankfurter Group (JJ. Reed, Jackson & Burton) and Justice Black Group (Ch.J. Warren, Douglas & Minton, JJ.), only the Chief Justice, Black and Douglas, JJ., remain on the Court.

In the meantime, of course, the Court perhaps more than at any time in its history has had both a dynamic interest in, and impact on, maritime law and its over-riding decisiveness under the Supremacy Clause in both admiralty and non-admiralty courts, federal and state. See Currie, Federalism and the Admiralty: "The Devil's Own Mess," 1960, The Supreme Court Review, p. 158.

**19.** See United States v. Pink, 1942, 315 U.S. 203, 216, 62 S.Ct. 552, 558, 86 L.Ed. 796, 810; Ohio ex rel. Eaton v. Price, 1960, 364 U.S. 263, 80 S.Ct. 1463, 4 L.Ed. 2d 1708; Cooper v. Aaron, 1958, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5; Durant v. Essex Co., 1869, 7 Wall. 107, 110, 19 L.Ed. 154, 156; Hertz v. Woodman, 1910, 218 U.S. 205, 30 S.Ct. 621, 54 L. Ed. 1001; Kovacs v. Cooper, 1949, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513, 10 A.L.R.2d 608.

**20.** See the opinion of Mr. Justice Clark in *Jane Smith:*

"It is also reasonable to read the Limited Liability Act as aimed at protecting only owners and charterers. The statute does not speak of suits against insurers. * * * [T]he limitation court is empowered to enjoin suits in other courts * * * only if the suits are against the owner, charterer or vessel * * *."

347 U.S. 409, at 426, 74 S.Ct. 608 at 617, 98 L.Ed. 806 at 820.

**21.** 46 U.S.C.A. § 187: "Nothing in sections 182, 183, 184, 185 and 186 of this title shall be construed to take away or affect the remedy to which any party may be entitled, against the master, officers, or seamen, for or on account of any embezzlement, injury, loss, * * * on account of any negligence, * * * of such master, officers, or seamen, respectively, nor to lessen or take away any responsibility to which any master or seaman of any vessel may by law be liable, notwithstanding such master or seaman may be an owner or part owner of the vessel."

ing vessel, not executive officers of the corporate shipowner.[22]

But as to the first, it is way too doctrinaire to stress so heavily the literal terms of the Act. Even assuming that ultimately on appropriate principles of law—state, federal, maritime, non-maritime, or amphibious—there may be personal, unlimited liability against a corporate officer for corporate actions participated in personally by such officer,[23] it does not follow that adjudication of this potential liability must necessarily be permitted wholly outside of the shipowner's limitation proceeding or in advance of its disposition. If this were inflexibly allowed, two risks, at least, are presented. One is that the insurance, frequently available to the corporate officers as additional omnibus assureds[24] might well be exhausted by the direct action judgments against the corporate officers, thus leaving the Shipowner without insurance at all. This was the big fear leading to the *Jane Smith* course. The other, and probably more important one, is the hazard that this inescapably trespasses upon the exclusive domain of the Admiralty in adjudicating whether the quality of the actions of the corporate officers is such as to charge the corporate shipowner with privity and knowledge of them. And considering the pervasive nature of res judicata and collateral estoppel, especially in situations where the defense is controlled by the corporate em-

ployer or one or more parties (disclosed or undisclosed) standing vicariously in its stead, it is no safe answer to state that the direct action judgment purports to adjudicate only the claims as between the injured party plaintiff and the individual corporate officer, not his principal. See, e. g., Bros. Inc. v. W. E. Grace Mfg. Corp., 5 Cir., 1958, 261 F.2d 428. This is especially true as to Louisiana direct actions where Courts pierce the fiction to consider both assured and insurer bound. Degelos v. Fidelity & Casualty Co., 5 Cir., 1963, 313 F.2d 809; Globe Indemnity Co. v. Richerson, 5 Cir., 1963, 315 F.2d 3, note 2; Maryland Casualty Co. v. Kador, 5 Cir., 1955, 225 F.2d 120; Chumbler v. Alabama Power Co., 5 Cir., 1966, 362 F.2d 161 [June 17, 1966, No. 22520].

This risk is vividly illustrated by the nature of this occurrence. The charge in the direct action cases (note 11, supra) and in the limitation proceeding (See notes 12, 13, 14, 15, supra) is one of personal, direct, immediate participation by the President and Vice President in the survey of the Barge MURRAY MAC and, more important, what it disclosed, knowledge of the existence of the highly dangerous explosive hazards and the deficiencies in the design and condition of the Barge making it unseaworthy. Since controlling substantive principles testing that liability will be maritime regardless of the forum, state or federal, in which

**22.** See Earle & Stoddart v. Ellerman's Wilson Line, S.D.N.Y., 1930, 45 F.2d 231, 1930 AMC 1712. Cf. Walker v. Western Trans. Co., 1866, 3 Wall. 150, 70 U.S. 150, 18 L.Ed. 172; Craig v. Continental Ins. Co., 1891, 141 U.S. 638, 12 S.Ct. 97, 35 L.Ed. 886.

**23.** "Of course, the individual by whom the tortious act is committed cannot himself escape liability on the ground that he was acting for the corporation. Such individual and the corporation are jointly liable and may be joined as defendants." 19 Am.Jur.2d Corporations § 1427.

"A director or officer of a corporation does not incur personal liability for its torts merely because of his official character; he is not liable for torts committed by or for the corporation unless he has participated in the wrong * * *."

See, Folwell v. Miller, 2d Cir., 145 F. 495, 10 L.R.A.,N.S., 332; Lee v. Griffith, 1932, La.App., 140 So. 142; see generally, City of Kiel v. Frank Shoe Mfg. Co., 245 Wis. 292, 14 N.W.2d 164, 152 A.L.R. 691; Adams v. Fidelity & Cas. Co., 1958, La.App., 107 So.2d 496.

**24.** The pleadings, without denial, so allege as to the Shipowner's liability insurance (note 6, supra). The record is silent as to the P & I insurance, a matter still of considerable possible significance even though not sued as such in the direct action cases in view of the possibility that a judgment plaintiff in the suit against the President and Vice President might secure satisfaction of the judgment by attachment, garnishment, sequestration, or the like.

the direct action suits are tried,[25] imposition of a personal liability on the corporate officers will involve almost, if not identically, the same issue as the Admiralty Court must face in resolving privity and knowledge. If—and there is no if about it at all—the Admiralty is the exclusive forum for determining privity and knowledge where a concursus proceeding has been timely instituted, Pershing Auto Rentals, Inc. v. Gaffney, 5 Cir., 1960, 279 F.2d 546, 1960 AMC 1287, it is too much to ask of a Judge who should exercise his exclusive responsibility independently on the basis of the record made before him to ignore, as would certainly be possible a series of one or more verdicts finding personal complicity on the part of the corporate officers. More important, simultaneous or prior trial of the direct action cases would inevitably mean a trial one, two, three, or four times of the very same issues. Much as in *Pershing Auto Rentals,* supra, this case discloses "that in the adjudication of liability *vel non* in the state court proceedings, the nature of this casualty [is] such that the acts relevant to the issue of privity and knowledge of petitioner would inevitably be involved. At the same time when it came to trying the admiralty proceedings * * * the admiralty court would have to retry the whole case again. In other words, the state court trial of the issue sometimes permissibly open to it could not avoid trial of the ingredients of the issue reserved exclusively for the admiralty." 279 F.2d 546, 551.

Thus far considerations argue strongly for a like sweeping stay as to corporate officers. But this is only part of it. If— and the if may be a big one—the Limitation of Liability Act does not protect the corporate officers and its operation is confined merely to protecting the purse of the Shipowner through priority orders as to insurance or the like, and an independent appraisal of the corporate officers' actions as bearing on the issue of privity and knowledge, the Damage Claimants are deprived of a valuable right to have the personal unlimited liability of the corporate officers determined in the forum of their choice and, as sought here, by a jury. By the nature of things, it is entirely conceivable that in the limitation proceeding the Admiralty Judge will determine that the corporate officers had no such personal complicity as to charge the Shipowner with privity and knowledge (and hence give rise to no personal liability against them). At the same time, it is entirely conceivable that in another proceeding, the Judge, or likely the jury, on the same facts could well find personal complicity and personal unlimited liability.

■ In view of these possible contrary results—a situation aggravated as the number of separate cases are multiplied —we ought to be certain that a stay entered to assure an orderly efficient administration of that part of the controversy committed exclusively to the Admiralty should not deprive these claimants of the valuable right to an opportunity to secure a different and more favorable finding *if and when* it is ultimately determined as a matter of substantive law that the Limitation of Shipowner's Liability Act does not forbid direct action suits and their prior or simultaneous trial against corporate officers (or liability insurers). A right so valuable ought not to be imperiled by the uncertainty of judicial determination, some in the state court, some in the federal court, perhaps finally at the apex in the United States Supreme Court, of the complex problems of res judicata, collateral estoppel, exclusive jurisdiction, voluntary or involuntary submission to one or more tribunals, or the like. Cf. England v. Louisiana State Bd. of Medi-

---

25. See, Kermarec v. Compagnie Generale Transatlantique, 1959, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550, 1959 AMC 1602; Fidelity & Casualty Co. of New York v. C/B Mr. Kim, 5 Cir., 1965, 345 F.2d 45; Thibodeaux v. J. Ray McDer-mott Co., 5 Cir., 1960, 276 F.2d 42, 47, n. 6, 1961 AMC 1469; Emerson v. Holloway Concrete Products Co., 5 Cir., 1960, 282 F.2d 271, 281, n. 10, 11, 1961 AMC 1923 (dissenting opinion).

cal Examiners, 1964, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440.

■ It is therefore appropriate that as a condition to the continuation of the restraining order the Shipowner and the Shipowner's Liability Insurer [26] (who thereby gets the benefit of the stay) and the Damage Claimants must enter into a suitable stipulation. The stipulation [27] should assure (a) the Damage Claimants upon completion of the limitation proceedings the right to assert in any appropriate Court, state or federal, independent of the Shipowner's limitation of liability proceedings, the claim for resolution by such Court (and appropriate appellate Courts), that they have a right to proceed against the corporate officers and (b) if that right is found to exist, none of the findings or conclusions of the Admiralty Court bearing upon the nature or quality of the actions of the corporate officers of the Shipowner will, by res judicata, collateral estoppel, or otherwise, foreclose independent re-examination, conclusion and judgment of such other court (or courts).

This means, of course, that because of the unavoidable conditional possibilities, res judicata-collateral estoppel may not reach some issues or parties it otherwise would and it may not always be mutually reciprocal. There are two major hypotheses (1) the limitation proceeding is tried first and the direct actions are stayed, and (2) the direct actions are tried first. In each are sub-possibilities: (1) (a) exoneration in the limitation proceeding, (b) exoneration denied but limitation allowed, (c) exoneration denied, limitation denied; and (2) (a) judgment on the merits for the executive officer's liability insurer and (b) judgment for damage claimants (i) for less or (ii) in excess of the policy limits, Take, for example, the possibility of complete exoneration. Since trial of the limitation proceeding encompasses (a) the Shipowner's negligence, if any, (b) privity and knowledge of such negligence, The Bolikow,[28] the finding of no negligence and hence necessarily of no privity—the equivalent of complete exoneration—might foreclose those appearing therein from reasserting a claim against the executive officers whose conduct was asserted on respondeat superior to be the corporate Shipowner's neglect. But if the Damage Claimants' protest and, on our hypothesis, ultimately sustain the legal correctness of their protest—that the limitation proceeding does not protect corporate officers (or their liability insurer) as such—it would be unconscionable to (a) avoid or postpone decision now as to the existence of that right and *at the same time* (b) charge them later with the legal consequences of a supposed voluntary submission despite involuntary coercion. Also res judicata-collateral estoppel does not

---

**26.** As it is, the Shipowner's Liability Insurer is not a party to this appeal or to the limitation proceedings, and yet it gets a direct benefit. It may not have its cake and eat it too. If it declines to enter into the stipulation, then the injunction should be suitably modified to permit the trial of the direct action cases against the corporate officers and the Liability Insurer in respect of the corporate officers. To avoid exhaustion of insurance, execution on any final judgment or judgments (after appeal or otherwise) or any satisfaction thereof out of insurance arguably available to the Shipowner should be prohibited by order of the Admiralty Court.

Requiring joinder is not to coerce waiver of policy defenses, coverage questions, etc. The stipulation in effect will be that subject to all policy terms, whatever fact or conclusion—other than matters concerning policy terms, provision, exceptions, etc.—is found or declared by the Admiralty Court as to the petitioner-Shipowner will be binding on the Shipowner's Liability Insurer and that it will also be bound by such stipulations as the Shipowner is required to make as a condition to continuing the restraining order in effect.

**27.** The stipulation must make clear that in the direct actions Damage Claimants do not challenge the (a) sufficiency of the limitation fund or (b) the right of the Shipowner to limit liability.

**28.** Hartford Accident & Indemnity Co. of Hartford v. Southern Pacific, 1927, 273 U.S. 207, 47 S.Ct. 357, 71 L.Ed. 612, 1927 AMC 402.

necessarily cut both ways. Where Damage Claimants are involuntary, acting under coercion, no such compulsion rests on the Shipowner, and those for whom it is responsible, or those who impute responsibility to it. Consequently, it is entirely conceivable that under the stipulation which we require, although Shipowner (or its insurers) could not invoke it as to findings of no fault, no privity, or both, the Damage Claimants might well be able to claim res judicata-collateral estoppel as to findings holding the executive officers at fault, see Pershing Auto Rentals, Inc. v. Gaffney, 5 Cir., 1960, 279 F.2d 546, 552, 1960 AMC 1287.

Similarly, in the event (1) (b) exoneration is denied but limitation is allowed, the Damage Claimants, having been impressed involuntarily into the concursus in actions against the executive officers (or insurers), ought not to be bound on our hypothesis by the finding that the quality of the acts done by those having the status of managing officers was not such as to charge the Shipowner with privity and knowledge thereof. On the other hand, to the extent that it might be relevant, the Shipowner and all in its stead are bound in the direct action cases on usual principles of res judicata-collateral estoppel on findings of corporate fault, unseaworthiness of the Vessel, or the like. In the event (1) (c) Shipowner is held at fault and limitation is denied, no problem remains. The Damage Claimants can take full advantage of the ad interim stipulation, *The Bolikow*, note 28,

supra, but, as we have indicated, Pershing Auto Rentals, Inc. v. Gaffney, 5 Cir., 1960, 279 F.2d 546, 552, 1960 AMC 1287, there is nothing to prevent the Damage Claimants from taking the fact and legal conclusions thus found over into the direct actions where they become res judicata leaving only the issue of quantum for the direct action proceedings.

Since the required stipulation envisages a complete disposition of the limitation of liability proceedings, we need not consider the impact of various outcomes on the assumption that the direct actions were first tried. Contemplation of this alternative, however, demonstrates the soundness of our practical administrative decision to postpone trial of the direct action suits against (a) the Liability Insurer of the Shipowner, as such, and (b) subject to the stipulation, the direct action suits against the Liability Insurer of the corporate officers. Whereas, in the event the limitation proceedings were first disposed of, res judicata-collateral estoppel works considerably in favor of the Damage Claimants and against the Shipowner on various contingencies, there is no reciprocal possibility if the direct action suits were tried first. True, the findings might well bind the parties, but chaos would result in the later effort to resurrect part of the limitation proceeding since some of the Damage Claimants would, some would not, be bound, as to some the Shipowner could claim judicial foreclosure as to some issues, as to others, he could not.[29]

---

29. The Shipowner's brief graphically illustrates the predicament:
    "For example, claimants-plaintiffs Guillot have filed their Direct Action suits in Orleans Parish, whereas claimant-plaintiff Andras has filed his Direct Action proceeding in Jefferson Parish. One could further presuppose that in other multiple claim cases some claimants-plaintiffs might file suits in various other Louisiana Parishes, and that some claimants might not file Direct Action suits at all. The confusion which would reign should these independent Direct Action suits each proceed to trial before the Limitation proceedings would be fantastic. Assuming multiple Direct Action suits such as

we have in this case, a judgment for insurers in one suit could not affect a second suit prosecuted by a different plaintiff against that same insurer. If the Guillots win in Orleans Parish, Andras would not benefit—and vice versa. Similarly, insofar as *res judicata* and collateral estoppel are concerned, how would the Admiralty Court handle the problem of different results in State Court where all of the State Court litigants are claimants in the Limitation proceedings? And what of the claimants who did not file Direct Actions? Could it be prudently said that they would not be affected at all? To present all of these issues at once, would the Admiralty Court be required

## II.

### Increasing the Ad Interim Stipulation

In the course of the limitation proceedings, the Shipowner filed an impleader under Admiralty Rule 56 against the Testing Laboratory and the Shipyard as permitted by the *Duke of York*.[30] The Shipowner sought recovery over by way of indemnity, contribution, or both, against each of these alleged tort feasors to the extent that it was case in judgment for any one or more or all of the claims of the Death and Injury Claimants. Since these self-serving claims of the Damage Claimants total $1,399,362.40, they insist that the ad interim stipulation of $49,000 (see note 10, supra) is inadequate, and the limitation proceedings cannot go on until the Shipowner surrenders this additional value or posts security therefor. The District Court rejected this contention and approved the voluntary increase to $49,000 to account fully for the potential recovery of the hull damage losses (see note 10, supra).

What is at issue, of course, is the surrender by the Shipowner of "the amount or value of the interest of such owner in the vessel and freight," 46 U.S.C.A. § 185, Admiralty Rule 51. This may be done in one or two principal ways, a surrender of the vessel and her pending freight, and potential claims against third parties to a trustee or, as here, giving approved security therefor. The question is whether the indemnity contribution claims constitute a part of "the interest of such owner in the" Barge MURRAY MAC.

No fault can be found with the authorities urged by Appellants. Thus, Benedict, 6th Ed. Vol. 3, p. 451, correctly states, "The shipowner's collateral rights against tortfeasors arising out of the accident or voyage must also be accounted for and added to the stipulation or assigned to the trustees." But these refer to claim for loss of or damage to the vessel and which, had they not been incurred, would have added to the value surrendered. Thus Benedict goes on to state, "Such rights are usually collision damages."

And this is true of every case cited by Benedict[31] and which are urged by Appellants. In one of these, the Supreme Court had this to say. "The clear purpose of Congress was to require the shipowner, in order to be able to claim the benefit of the limited liability act, to surrender to the creditors of the ship *all rights of action which were directly representative of the ship and freight.* \* \* We conclude that the owner who retains the sum of the damages which have been awarded him for the loss of his ship and freight has not surrendered 'the amount or value' (section 4283) of his interest in the ship \* \* \*." (Emphasis added.) O'Brien v. Miller, supra, 168 U.S. 287, 303, 18 S.Ct. 140, 146.

And the other cases urged are not in conflict. Geotechnical Corp. of Delaware v. Pure Oil Co., 5 Cir., 1952, 196 F.2d 199, 1952 AMC 727, deals with the obligation of the Petitioner to surrender to the trustee "any claim it may have against [the third party] for damage to the [ves-

---

to wait until all of the Direct Action suits were consummated—perhaps even through appeals? To further complicate matters, what would be the result of the *res judicata* and collateral estoppel issues in the Limitation proceedings if in some Direct Action suits only negligence was pleaded, if in others only unseaworthiness, and if in still others both negligence and unseaworthiness were pleaded? How could *res judicata* or collateral estoppel be pleaded to some of these allegations in Limitation and not to others, depending on which claimant pleaded what in his Direct Action suit?"

30. The British Trans. Comm'n v. United States, 1957, 354 U.S. 129, 77 S.Ct. 1103, 1 L.Ed. 1234, 1957 AMC 1151.

31. Phillips v. Clyde S. S. Co., 4 Cir., 1927, 17 F.2d 250, 1927 AMC 341; O'Brien v. Miller, 1897, 168 U.S. 287, 18 S.Ct. 140, 42 L.Ed. 469; The Andree, S.D. N.Y., 1930, 41 F.2d 812, 2 Cir., 1931, 47 F.2d 874, 1931 AMC 634; Petition of Navigazione Libera Triestina, E.D. N.Y., 1929, 34 F.2d 150; The Bleakley No. 76, S.D.N.Y., 1932, 56 F.2d 1037, 1932 AMC 307; each involving claim for hull damage.

sel]." [32] And to the contrary, we agree with the only case any of the parties have been able to cite which bears directly on this problem. In Petition of Western Transportation Company, D.C.Ore., 1961, 194 F.Supp. 834, 837, the Court rejected the contention that the shipowner should surrender the value of its third party indemnity claims. "No case has been found by or furnished to this Court which suggests that the owner of the vessel should be required to surrender a claim for indemnity other than claims which go to make whole the vessel and freight surrendered. It is this Court's conclusion that such is not the law."

█ The theory of the limitation of liability Act is that the shipowner is not liable for damages or injuries occurring without its privity or fault beyond the value of the vessel (and pending freight) immediately after the casualty. Claims for indemnity, contribution, or both against third party alleged tort feasors can in no sense add to that value. That by virtue of third party indemnity recovery, a shipowner denied exoneration but allowed to limit recoups it 100% from a third party tort feasor does not add to "the amount or value of the interest of such owner" in the vessel. It is merely recoupment from a collateral source not unlike recoveries from underwriters of the proceeds of insurance carried on the vessel. The City of Norwich, 1886, 118 U.S. 468, 6 S.Ct. 1150, 30 L.Ed. 134; Gilmore & Black, The Law of Admiralty, p. 712 (1957).

█ The District Court's action was therefore correct in not requiring the surrender of the value of the third party indemnity claims or security therefor

The cause is therefore remanded for further and other consistent proceedings.[33]

Affirmed and remanded.

32. See Judge J. Skelly Wright's opinion in the District Court, 94 F.Supp. 866, 870, E.D.La., 1951.

33. The trial Court has vast powers to secure the making and compliance with the stipulation in good faith. See, e. g., F.R.Civ.P. 41(b) (c), 16.