In the Matter of the Complaint of PARADISE HOLDINGS, INC., a Hawaii corporation, as owner of, and Paradise Cruise, Limited, a Hawaii corporation, as lessee and charterer of the P/V PEARL KAI, Official Number 527 873, for exoneration from or limitation of liability.

No. CV 84–0783 PAR.

United States District Court, C.D. California.

Dec. 26, 1984.

David Schutter, Schutter, Cayetano & Playdon, Honolulu, Hawaii, for claimant Terry Stone.

Robert Frame, Alcantara & Frame, Honolulu, Hawaii, for limitation plaintiffs, Paradise Holdings, Inc. and Paradise Cruise, Ltd.

## MEMORANDUM OF DECISION AND ORDER

RYMER, District Judge.

This case arises from the death of Paul H. Stone who was killed while body surfing near the Kewalo Basin in Honolulu. According to the complaint filed in Hawaii state court by Stone's widow and minor children, the captain of the Pearl Kai, a commercial cruise ship, piloted the craft in high surf conditions in the vicinity of a number of body surfers. Returning from a

Pearl Harbor cruise, the ship was turned broadside to an incoming wave. In order to gain control of the vessel, the captain allegedly reversed the engine, backing the ship into a group of body surfers. The propeller struck Stone repeatedly, killing him instantly.

The state court action names Paradise Holdings Corp., Paradise Cruise Ltd. and the Pearl Kai's captain, Edward Bruhn, as defendants. It alleges negligence, gross negligence, assault and battery and infliction of emotional distress and seeks $23 million in compensatory and punitive damages.

Pursuant to the Limitation of Liability Act, 46 U.S.C. §§ 183 *et seq.* ("the Limitation Act"), Paradise Holdings Corp. and Paradise Cruise Ltd. filed a Complaint for Exoneration from and Limitation of Liability in federal district court in Hawaii. The complaint, based on the admiralty jurisdiction of the federal courts, requested a stay of all state court proceedings against Paradise Holding Corp. and Paradise Cruise, Ltd. and the issuance of a restraining order and notice to claimants directing them to file their claims in the federal court proceeding. District Judge Harold M. Fong ordered the stay and issued the restraining order and notice. Under the Limitation Act, the liability of the ship's owner for injury or damage cannot exceed the value of the vessel. 46 U.S.C. § 183. In this case, the Pearl Kai is estimated to be worth $625,000, an amount which would also be applied to remedy injuries allegedly sustained by other body surfers and the ship's passengers. In addition to the claimants' action, over $1.2 million in claims have been filed by others as a result of the accident.

Decedent's survivors [hereinafter referred to as claimant] move to dismiss the complaint for limitation of liability on the ground that the death of a body surfer is not within the admiralty jurisdiction of this Court. Alternatively, claimant seeks to modify the restraining order to allow the state court action to proceed against the ship's captain, on the ground that they have an absolute statutory right to do so

under 46 U.S.C. § 187. These issues are considered in turn.

## I. *Admiralty Jurisdiction.*

Federal admiralty jurisdiction over maritime torts is provided by 28 U.S.C. § 1333 which states:

"The district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitor in all cases all other remedies to which they are otherwise entitled."

Congress has specifically extended admiralty jurisdiction to cases arising from injuries suffered on navigable waters. In the Extension of Admiralty Jurisdiction Act, Congress provided:

"The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land."

46 U.S.C. § 740.

Prior to the Supreme Court's decision in *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), admiralty jurisdiction would have almost certainly covered this suit. Before *Executive Jet*, admiralty jurisdiction over tort cases traditionally depended on the locality of the wrong. If the wrong took place in navigable waters, admiralty jurisdiction was properly invoked. If the wrong occurred on land or in non-navigable waters, admiralty jurisdiction was lacking. Although there existed authority to the contrary, the general rule was that any tort occurring on the high seas or navigable waters was cognizable in admiralty jurisdiction. *See* 1 Benedict, *Admiralty*, § 2.

However, the unanimous decision in *Executive Jet* held that, at least with respect to aviation torts, the locality of the wrong in itself was not sufficient to invoke admiralty jurisdiction. *Id.* at 261, 93 S.Ct. at 501. *Executive Jet* involved the crash of a

jet aircraft on takeoff into the navigable waters of Lake Erie. The Court reviewed the criticism of the locality rule to admiralty jurisdiction and noted the "absurd" results that the locality rule would yield when applied mechanically. For example, the Court observed that "if a swimmer at a public beach is injured by another swimmer or by a submerged object on the bottom, ... a literal application of the locality test invokes not only the jurisdiction of the federal courts, but the full panoply of the substantive admiralty law as well." *Id.* at 255, 93 S.Ct. at 498. The Court held that with respect to claims arising from airplane accidents, the alleged wrong must occur in navigable waters and "bear a significant relationship to traditional maritime activity." *Id.* at 267, 93 S.Ct. at 504.

While *Executive Jet* was limited on its facts to aviation accidents, in *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), the Court considered whether admiralty jurisdiction could be properly asserted in an action to recover for a death resulting from the collision on a navigable river of two boats used exclusively for recreational use. The Court extended the holding of *Executive Jet* to torts in a maritime context, concluding that "[b]ecause the 'wrong' here involves the negligent operation of a vessel on navigable waters, we believe that it has a sufficient nexus to traditional maritime activity to sustain admiralty jurisdiction in the District Court." *Id.* at 2658. The Court also held, despite a sharp dissent, that "there is no requirement that 'the maritime activity be an exclusively commercial one.'" *Id.* at 2658.

In applying the *Foremost* test here, the parties initially dispute whether the wrong complained of occurred in navigable waters. Claimant contends that the body surfing area known as Point Panic, where Stone's death is alleged to have occurred, is not in navigable waters because it is a recreational area and not "an artery of commerce." Point Panic is immediately adjacent to the channel leading into the Kewalo Basin and is reserved by the State of Hawaii as a site primarily for swimming

and body surfing. See Hawaii Admin. Rules § 19–85–14. The Kewalo Basin is used as a harbor by private pleasure boats as well as commercial cruise ships. A dredged channel approximately 210 feet in width leads from the Pacific Ocean through the coral reefs to the Basin. (Gray Decl., ¶ 4.) The channel is marked by navigational aids maintained by the United States Coast Guard. (Richards Decl., ¶ 5.) According to claimant's state court complaint, the Pearl Kai was swept broadside by a large wave while entering the Kewalo Basin channel. Its captain then backed the vessel into the body surfing area where the accident occurred.

### A.  *Navigability of the Point Panic Area.*

For purposes of admiralty jurisdiction, navigable waters include those which are "used or susceptible of being used as an artery of commerce." *The Propeller Genesee Chief v. Fitzhugh*, 12 How. 443, 13 L.Ed. 1058 (1852); *Kaiser Aetna v. United States*, 444 U.S. 164, 172 n. 7, 100 S.Ct. 383, 389 n. 7, 62 L.Ed.2d 332 (1979); *Adams v. Montana Power Co.*, 528 F.2d 437 (9th Cir.1975) *citing The Daniel Ball*, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1871). In this country's early history and perhaps owing to the British heritage of our jurisprudence, admiralty jurisdiction was determined by whether the waters were subject to the ebb and flow of the tides. *See e.g. The Steamboat Thomas Jefferson*, 23 U.S. (10 Wheat.) 428, 6 L.Ed. 358 (1825). Although *The Propellor Genesee Chief* and *The Daniel Ball* have been read to overrule the ebb-and-flow test, there is some question whether that test is truly extinct today. In *United States v. Stoeco Homes, Inc.*, the Third Circuit held that in tidal water, the test for admiralty jurisdiction remains the ebb and flow of the tide. 498 F.2d 597, 610 (3d Cir.1974). *See also Otto v. Alper*, 489 F.Supp. 953, 954 n. * (D.Del. 1980) ("In tidal waters no showing of actual or potential navigability is required.")

■ However, under either definition the allegedly tortious conduct occurred in navigable waters. Clearly, the waters in question, in the Pacific Ocean approximately 70 yards from the shoreline, are subject to the ebb and flow of the tides. In addition, the area's proximity to the channel and ocean-going traffic makes it susceptible to commercial use, particularly during high surf conditions.

Claimant relies on *Adams v. Montana Power Co., supra,* for the proposition that waters which are used, as a practical matter, for recreational purposes cannot support admiralty jurisdiction. In *Adams,* the court considered whether a portion of the Missouri River wholly within Montana and dammed at both ends was navigable water for purposes of admiralty jurisdiction. The trial court found that the section of the river in question was used only by non-commercial fishermen, water skiers and pleasure boaters. *Adams, supra* at 439. Of paramount importance to the Ninth Circuit was the fact that there was no federal interest where the body of water lacked commercial activity. The court observed:

> "The purpose behind the grant of admiralty jurisdiction was the protection and promotion of the maritime shipping industry through the development and application, by neutral federal courts, of a uniform and specialized body of federal law. [citation, footnote omitted] The strong federal interest in fostering commercial maritime activity outweighed the interest of any state in providing a forum and applying its own law to regulate conduct within its borders. It follows that admiralty jurisdiction need and should extend only to those waters traversed or susceptible of being traversed by commercial craft. In the absence of commercial activity, present or potential, there is no ascertainable federal interest justifying the frustration of legitimate state interests." 528 F.2d at 439.

Because the river had no commercial activity, present or potential, there was no federal interest in exercising admiralty jurisdiction. *Id.* at 440.

Here, the accident which gave rise to this lawsuit amply demonstrates that the Point Panic waters are capable of being used by commercial traffic under some circumstances. That the Point Panic area is an area reserved primarily for recreational water sports does not alter the fact that it is used or susceptible to use as a commercial waterway at certain times. The efforts of the United States Coast Guard to maintain the navigability of the channel leading to the Kewalo Basin as well as other harbor areas in Honolulu is further evidence of the strong federal interest in uniform rules of navigation in a commercial maritime context. (See Gray, Richards Decls.)

*Adams* has been construed by some courts as requiring present, actual commercial activity before admiralty jurisdiction is properly invoked. *See Livingston v. United States,* 627 F.2d 165 (8th Cir.1980); *Chapman v. United States,* 575 F.2d 147 (7th Cir.1978) (en banc) *cert. denied* 439 U.S. 893, 99 S.Ct. 251, 58 L.Ed.2d 239 (1978). But *Adams* does not require systematic commercial traffic before admiralty jurisdiction will attach. The circuit's decision clearly allows for the exercise of admiralty jurisdiction where there is "potential" commercial activity. In this case, the proximity of Point Panic to the Kewalo Basin and a busy harbor which routinely convey commercial transportation provides the requisite "potential" or "susceptibility" to warrant admiralty jurisdiction.

Moreover, it is consistent with the federal interest in uniform rules of conduct and liability that admiralty jurisdiction not depend on the actual presence of commercial shipping. To do so would subject shipping interests to varying rules and standards of liability depending only on whether commercial vessels traverse an area routinely. The federal interest in uniform maritime transportation would depend to a large extent on traffic patterns of commercial vessels. "Finding admiralty jurisdiction ... where the water bodies are potential ... highways of commerce because they are susceptible to or capable of such use,

serves the purpose of making uniform rules of conduct, including the navigational rules, 'Rules of the Road,' light requirements, etc., applicable to all interstate maritime traffic, whether commercial or pleasure." *Finneseth v. Carter*, 712 F.2d 1041, 1046–47 (6th Cir.1983). Because the Point Panic area has been used on at least this occasion and is susceptible to use by commercial maritime traffic, it constitutes navigable waters for purposes of admiralty jurisdiction.

### B. *Relationship Between the Wrong and Traditional Maritime Activities.*

The second prong of the *Foremost* test is also met here. By analyzing the relationship of the "wrong" to "traditional maritime activity," the *Foremost* test focuses the inquiry on the allegedly tortious conduct. *But see Union Oil Co. v. Oppen*, 501 F.2d 558, 561 (9th Cir.1974) ("the 'activity' whose relationship to traditional maritime activity was to be examined was that of the injured party, not that of the tortfeasor.") In *Foremost*, the wrong was the negligent operation of a recreational vessel on navigable waters and it was held to have a sufficient nexus to traditional maritime activity to justify admiralty jurisdiction. Here, the wrong complained of is the allegedly negligent operation of a commercial cruise ship returning to its harbor. As in *Foremost*, such conduct is a traditional maritime activity and admiralty jurisdiction is therefore properly invoked.

In *Owens-Illinois, Inc. v. United States District Court*, the Ninth Circuit considered four factors to determine if an alleged tort bears a significant relationship to traditional maritime activity: (1) traditional concepts of the role of admiralty law; (2) the function and role of the parties; (3) the types of vehicles and instrumentalities involved; (4) the causation and nature of the injury suffered. 698 F.2d 967, 970 (9th Cir.1983).

Applying these factors, it is beyond doubt that one role of admiralty law is to redress injuries caused by the navigation of a commercial ship in navigable waters. The negligent piloting of a commercial craft has the "maritime flavor" necessary to support admiralty jurisdiction. *Owens-Illinois*, 698 F.2d at 970. Also, the role of the ship, its owners and pilot is wholly of a maritime character. Similarly, the cruise ship and the instrumentality of the injury, its propellor, are maritime in nature. Although the decedent was not on a ship, his purposeful presence in navigable waters adds to the maritime character of the accident. Finally, the nature of the injury, contact with the propellor, and its alleged cause, the negligent operation of the Pearl Kai, have a substantial maritime connection. Thus, under the four part test articulated in *Owens-Illinois*, the tort alleged bears a relationship to traditional maritime activity sufficient to establish admiralty jurisdiction.

Cases where injuries to swimmers were held to be inappropriate to sustain admiralty jurisdiction, *see Crosson v. Vance*, 484 F.2d 840 (4th Cir.1973); *Marroni v. Matey*, 492 F.Supp. 340 (E.D.Pa.1980); *Jorsch v. LeBeau*, 449 F.Supp. 485 (N.D.Ill.1978); *Webster v. Roberts*, 417 F.Supp. 346 (E.D. Tenn.1976); *Medina v. Perez*, 575 F.Supp. 168 (D.P.R.1983) *rev'd* 733 F.2d 170 (1st Cir.1984), involved collisions between a swimmer and pleasure boat and were decided before *Foremost* made clear that noncommercial, recreational vessels could be subject to admiralty jurisdiction. "There is no requirement that two vessels be involved in order to create admiralty jurisdiction ... The actor in this case was a vessel, and that is enough. Once given that defendant's boat is not excluded because non-commercial, it should make no difference that plaintiffs were in navigable waters rather than on them." *Medina*, 733 F.2d at 171. *See also Kuntz v. Windjammer Cruises, Ltd.*, 573 F.Supp. 1277 (D.Pa. 1983) (admiralty jurisdiction appropriate where civil action arose from negligence of crew of a commercial vessel leading to death of fee paying passenger); *Moye v. Henderson*, 496 F.2d 973 (8th Cir.1974) (the operation of a boat on navigable waters, no

matter what its size or activity, is a traditional maritime activity to which admiralty jurisdiction attaches).

## II. *Modification of the Restraining Order.*

On July 17, 1984, Judge Fong issued the stay and restraining order enjoining prosecution of suits against plaintiffs Paradise Holdings, Inc. and Paradise Cruise, Ltd. arising from the accident. The court ordered:

"that the continued prosecution of any and all suits, actions and proceedings which may have already begun against the Plaintiffs in any Court whatsoever to recover damages arising out of, or occasioned by, or consequent upon, the aforesaid accident or otherwise arising during the voyage in which the P/V Pearl Kai was then engaged, and the institution and prosecution of any suits, action or legal proceedings of any nature or description whatsoever in any court whatsoever, except in this proceeding for exoneration from or limitation of liability, against Plaintiffs with respect to any claim or claims arising out of the aforesaid accident or otherwise arising during the voyage on which the P/V Pearl Kai was then engaged, or otherwise subject to limitation in this proceeding, be, and the same hereby are stayed and restrained ..."

Pending in state court is the action filed by claimant against the captain of the Pearl Kai, Edward Bruhn, and Paradise Holdings, Inc. and Paradise Cruise, Ltd. The ship's captain is not a plaintiff in the limitation proceeding in federal court and, literally read, the restraining order is inapplicable to him. Nevertheless, claimant believes the restraining order to be susceptible to an interpretation that would restrain all actions arising from the accident and would therefore bar their suit against the captain. Moreover, claimant asserts that § 187 of the Limitation Act provides a statutory right to proceed against the captain in state court. Section 187 states:

"Nothing in sections 182, 183, 184, 185 and 186 of this title shall be construed to take away or affect the remedy to which any party may be entitled, against the master, officers, or seamen, for or on account of any embezzlement, injury, loss, or destruction of merchandise, or property, put on board any vessel, or on account of any negligence, fraud, or other malversation of such master, officers, or seamen, respectively, nor to lessen or take away responsibility to which any master or seaman of any vessel may by law be liable, notwithstanding such master or seaman may be an owner or part owner of the vessel."

46 U.S.C. 187.

On the other hand, plaintiffs contend that for policy reasons underlying the Limitation Act, the restraining order must apply to the state court action against the captain. Specifically, plaintiffs argue that to allow the state court to decide issues of liability and damages would defeat the purpose and effectiveness of the Limitation Act as a whole. This case is complicated by two factors: first, there are multiple claims which exceed both the value of the ship and the amount of insurance available; and second, claimant indicates that plaintiffs carried $3 million in liability insurance which names the captain as an insured.

Read in isolation, § 187 indicates that the action in state court against the captain of the Pearl Kai should not be enjoined. Staying the state court action "affects" the remedy to which claimant may be entitled in two ways. First, it would delay the resolution of the state court proceeding. Second, claimant might be collaterally estopped from the opportunity to try the issue of the captain's liability before a jury by virtue of findings made in the limitation proceeding.

However, § 187 must be construed in concert with the Limitation Act and its purposes. The Limitation Act furthers several purposes. In addition to limiting the liability of shipowners, the Limitation Act aims "to ensure the prompt and economical disposition of controversies in which there

are often a multitude of claimants." *Maryland Casualty Co. v. Cushing*, 347 U.S. 409, 415, 74 S.Ct. 608, 611, 98 L.Ed. 806 (1954). It does so by collecting all claims before one tribunal to be adjudicated on one set of facts. In the process, repetitive litigation and inconsistent results are avoided. *Id.* Even more importantly, the limitation proceeding allows the equitable distribution of an inadequate fund among claimants by marshalling assets. *Maryland Casualty Co. v. Cushing*, 347 U.S. 409, 417, 74 S.Ct. 608, 612, 98 L.Ed. 806 (1954); *Pershing Auto Rentals, Inc. v. Gaffney*, 279 F.2d 546, 551 (5th Cir.1960).

To allow the claimant to sue the captain in state court would adversely affect the limitation proceeding in several ways. First, if the captain is indeed a named insured under the plaintiffs' liability insurance, a judgment against the captain could endanger the insurance fund to the detriment of those claimants whose rights will be determined in the limitation proceeding. *See In the matter of Spanier Marine Corp.*, 1983 A.M.C. 2441 (E.D.La.1983) (pursuing the insurance carrier could indirectly exhaust the vessel owner's insurance and interfere with and possibly defeat the whole limitation proceeding); *Olympic Towing Corp. v. Nebel Towing Co.*, 419 F.2d 230, 235 n. 17 (5th Cir.1969) ("the reason for requiring the limitation proceeding to be completed first is to permit the vessel owner to receive the benefit of his insurance.")

▇ In this case, claimant seeks damages in excess of $24 million. Other claimants in the limitation proceeding have asserted over $1.2 million in claims. Were the insurance proceeds to be depleted by the claimant in the state court action against the captain, all other claimants would be confined to the limitation proceeding and a fund not greater than the estimated $625,000 value of the Pearl Kai. Additionally, the claimant in state court would have her case tried before a jury under principles of tort law. The limitation proceeding would presumably be tried to the court under rules of admiralty. The differences between the two forums and the amounts of relief available in each might induce some claimants to also seek recovery against the captain in state court. The end result would be to relegate the limitation proceeding to a role of secondary importance rather than the central adjudication it was intended to be. *See Pershing Auto Rentals, Inc. v. Gaffney*, 279 F.2d 546, 549 (5th Cir.1960). Moreover, those claimants who depended on the limitation action for redress of their injuries would be at a disadvantage compared to those who proceeded against the captain under principles of tort law in state court and recovered from the insurance proceeds. Such a result would obviously defeat the equitable marshalling of assets that the Limitation Act contemplates.

Second, allowing claimant to proceed against the captain in state court could subject the limitation action to collateral estoppel effects resulting from the state court adjudication. *Guillot v. Cenac Towing Co.*, 366 F.2d 898, 907 (5th Cir.1966). At this point it is not possible to tell whether principles of collateral estoppel will definitely apply to the limitation proceeding following a state court trial of the captain's liability. However, the role of the admiralty proceedings as the central adjudicator would be diminished if it were bound by findings made in another forum. Even if the limitation proceeding were not so constrained, trying the same issues for a second time would result in the inefficient use of judicial resources which the Limitation Act seeks to prevent.

On balance, the purposes of the Limitation Act require that the claimant's action against the captain in state court be stayed pending the outcome of the limitation proceedings. To adhere to a literal reading of § 187 would, in this case, greatly compromise the purposes of the Limitation Act. Concededly, the stay affects claimant's remedies against the captain but to an extent not inconsistent with the underlying aims of the Limitation Act as a whole. Upon completion of the limitation action, claimant will be free to pursue its rights

against the captain and the insurance proceeds, if applicable, in state court.

It is therefore ordered that:

1. Claimant's motion to dismiss for lack of subject matter jurisdiction is denied;

2. The restraining order is extended to stay any actions against the captain in state court pending the completion of the proceedings in admiralty.