In the Matter of The Complaint of PARA-DISE HOLDINGS, INC., a Hawaii corporation, as owner of, and Paradise Cruise, Limited, a Hawaii corporation, as lessee and charterer of the P/V PEARL KAI, Official Number 527 873, for exoneration from or limitation of liability.

Terry Lee K. STONE, Individually; As Special Administratrix of the Estate of Paul Henry Stone; and As Guardian Ad Litem for Paul Henry Stone, Jr., a minor, and Jeremy Noah Kamealohao-kuulei Stone, a minor, Claimants-Appellants,

v.

PARADISE HOLDINGS, INC. and Paradise Cruise, Limited, Appellees.

Nos. 85–1648, 85–1889.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 27, 1986.

Decided July 25, 1986.

---

George W. Playdon, Jr., Robert K. Merce, Honolulu, Hawaii, for claimants-appellants.

Robert G. Frame, Leonard Alcantara, Alcantara & Frame, Honolulu, Hawaii, for appellees.

Before FERGUSON, CANBY and HALL, Circuit Judges.

CANBY, Circuit Judge:

On June 19, 1984, Paul Stone was killed while bodysurfing in a recreational area known as Point Panic, near Kewalo Basin in Honolulu. Boating is prohibited in Point Panic, and navigation is at best treacherous due to shallow water and large reefs. By contrast, the adjacent Kewalo Basin Channel is dredged and is an established shipping lane.

According to the allegations, at about noon on June 19, the P/V Pearl Kai, owned by Paradise,[1] entered the Channel on return from a Pearl Harbor cruise. The surf was high, and several hundred passengers were aboard. After its port engine failed, the ship was apparently turned broadside by a large incoming wave. In order to regain control of the vessel, the captain reversed the ship's starboard engine, backing the vessel into a group of bodysurfers swimming in the Point Panic area. Several passengers and swimmers were injured, and Stone was killed. As a result of the incident, claims totalling more than $28 million were filed against the ship's owners and crew.

Stone's survivors filed an action in Hawaii Circuit Court against Paradise and the Pearl Kai's captain. Paradise then filed an action in federal court, under the Shipowners Limitation of Liability Act of 1851, 46 U.S.C. § 181–95 ("the Act"), seeking limited protection from the claims.[2] Jurisdiction was based on 28 U.S.C. § 1333. Paradise was granted an injunction staying prosecution of the state court action pending outcome of the federal proceeding.

On July 31, 1984, claimants moved to dismiss the limitation action for lack of admiralty jurisdiction. In addition, because their state action named the ship's captain as a defendant, they moved to dissolve the stay as violating 46 U.S.C. § 187.[3] 619 F.Supp. 21. Both motions were denied, and claimants appealed. The jurisdiction question was certified for interlocutory appeal under 28 U.S.C. § 1292(b); the other issue is appealable under 28 U.S.C. § 1292(a)(1). We affirm.

## DISCUSSION

### I. *Admiralty Jurisdiction*

A district court's decision that it has subject matter jurisdiction is reviewed *de novo*. *Carpenters Southern California*

---

1. The ship was owned by Paradise Holdings, Inc., and chartered by Paradise Cruise Ltd. We refer to these appellees collectively as Paradise.

2. The Act limits vessel owners' liability for claims, arising from acts performed by a ship's crew without the owner's knowledge or privity, to the owners' interests in the ship. If the ship's value is insufficient to satisfy all claims, the Act provides for equitable apportionment among the claimants. 46 U.S.C. § 184. Vessel owners must file a petition to limit liability in the appropriate federal district court within six months after a claimant notifies an owner of a claim. 46 U.S.C. § 185. For purposes of the Act, the charterer of any vessel is deemed to be an owner. 46 U.S.C. § 186. Thus, Paradise Cruise Ltd. is also a limitation plaintiff.

3. 46 U.S.C. § 187 states, in pertinent part:

Nothing in sections 182, 183, 184, 185 and 186 of this title shall be construed to take away or affect the remedy to which any party may be entitled, against the master, officers, or seamen, for or on account of any ... negligence, fraud, or other malversation of such master, officers, or seamen, respectively, nor to lessen or take away any responsibility to which any master or seaman of any vessel may by law be liable, notwithstanding such master or seaman may be an owner or part owner of the vessel.

*Administrative Corp. v. Majestic Housing,* 743 F.2d 1341, 1343 (9th Cir. 1984). We conclude that the district court had jurisdiction.

■ To invoke the federal admiralty jurisdiction in tort cases, the tort must occur on navigable waters and bear a "significant relationship to traditional maritime activity." *Foremost Insurance Co. v. Richardson,* 457 U.S. 668, 672–75, 102 S.Ct. 2654, 2656–58, 73 L.Ed.2d 300 (1982); *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 268, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972).

### A. Navigable Waters

■ Because of shallow water, reefs and state regulations prohibiting boating in the area, claimants argue that the waters of Point Panic are not navigable for purposes of admiralty jurisdiction. We disagree.

The waters in question are clearly subject to the ebb and flow of the tides. Throughout the nation's history, tidal waters have been held to be within the definition of "navigable waters." Indeed, until 1851 admiralty jurisdiction was limited to waters "within the ebb and flow of the tide." *The Steamboat Thomas Jefferson,* 23 U.S. (10 Wheat.) 428, 428, 6 L.Ed. 358 (1825).

Claimants argue that the tidal waters test was abolished in *The Propeller Genesee Chief v. Fitzhugh,* 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1851). That case, however, never held that tidal waters were not "navigable waters" for admiralty-jurisdiction purposes. Instead, it held that admiralty jurisdiction extended beyond tidal waters to all navigable waters. *See id.* 53 U.S. at 454–58. The Third Circuit has held squarely that *Propeller Genesee* involved only an expansion of admiralty jurisdiction

and implied no contraction. *See United States v. Stoeco Homes, Inc.,* 498 F.2d 597, 610 (3d Cir. 1974), *cert. denied,* 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975). We hold that in tidal waters, the ebb and flow of the tides remains the standard.

Claimants rely on cases that explore navigability on inland waterways, such as *Adams v. Montana Power Co.,* 528 F.2d 437 (9th Cir. 1975). There, we held that federal courts had no jurisdiction over a tort claim for loss suffered when the discharge from Hauser Dam capsized a small pleasure craft, drowning one person. The accident occurred on a 25-mile stretch of the Missouri River dammed at both ends and situated entirely within the State of Montana. Only non-commercial fishermen, water skiers and pleasure boaters made use of the river. *Id.* at 439. We stated that "[a] waterway is navigable provided that it is used or susceptible of being used as an artery of commerce." *Id.* Because we concluded that none of the activities on the river constituted commerce, we held the action was not cognizable in admiralty. *Id.*[4] This ruling extends only to inland bodies of water and was not intended to alter the rule pertaining to tidal waters.

### B. Traditional Maritime Activity

■ The second test for admiralty jurisdiction is whether the tort arose from traditional maritime activity. We have identified four factors as important in this determination: "(1) traditional concepts of the role of admiralty law; (2) the function and role of the parties; (3) the types of vehicles and instrumentalities involved; and (4) the causation and nature of the injuries suffered." *Solano v. Beilby,* 761 F.2d 1369, 1371 (9th Cir. 1985) (citing *Owens-Illinois, Inc. v. United States Dist. Ct.,* 698 F.2d 967, 970 (9th Cir. 1983) (per curiam) ).[5] The

---

**4.** Since *Adams,* the Supreme Court has made clear that the traditional maritime activity that is a prerequisite of admiralty jurisdiction need not be commercial activity. *See Richardson,* 457 U.S. at 674–75, 102 S.Ct. at 2658 (finding admiralty jurisdiction over a tort claim involving a collision of two pleasure boats).

**5.** Claimants seem to argue for a fifth factor: whether the parties were engaged in commercial maritime activity. The argument is incorrect. First, the Pearl Kai clearly was involved in commercial activity at the time of the accident. It had hundreds of paying passengers on board. Second, the Supreme Court has made clear that the traditional maritime activity that

principal focus of admiralty jurisdiction is "'the protection of maritime commerce.'" *Solano*, 761 F.2d at 1371 (quoting *Richardson*, 457 U.S. at 674, 102 S.Ct. at 2658).

At the outset, the parties dispute the proper method for applying these factors. Claimants seize upon a sentence from *Union Oil Co. v. Oppen*, 501 F.2d 558, 561 (9th Cir. 1974), which states: "[T]he 'activity' whose relationship to traditional maritime activity was to be examined was that of the injured party, not that of the tortfeasor." Their reliance on this statement is misplaced.

First, the statement is not a holding. It is an approximate paraphrase of a holding in a related case, *Oppen v. Aetna Insurance Co.*, 485 F.2d 252, 257 (9th Cir. 1973), and is included in *Union Oil* by way of background. The holding in *Aetna* was that the nature of the tortfeasors' activities is "not dispositive" of the traditional maritime activity issue. The *Aetna* court went on to hold that, because of the maritime nature of the plaintiffs' claim, the suit was cognizable in admiralty despite the arguably non-maritime activities of the defendant that gave rise to the claim. 485 F.2d at 257. Thus, under *Aetna* it is more accurate to say that the focus should not be *solely* on the defendant's activities when making the "maritime activity" determination.

More important, the Supreme Court in *Richardson* stated that the focus should be on the "wrong" underlying the claim rather than on either party. 457 U.S. at 674, 102 S.Ct. at 2658. The Court stated: "Because the 'wrong' here involves the negligent operation of a vessel on navigable waters, we believe that it has a sufficient nexus to traditional maritime activity to

is requisite for admiralty jurisdiction need not be *commercial* maritime activity. *Richardson*, 457 U.S. at 674–75, 102 S.Ct. at 2658.

**6.** In *Medina*, two swimmers were injured when they were struck by a small outboard-powered pleasure boat as they were swimming about 120 feet off shore at a public beach in Puerto Rico. Applying *Richardson*, the court found the case cognizable in admiralty. Indeed, the First Cir-

sustain admiralty jurisdiction in the District Court." *Id.*

■ Applying the *Solano* factors, we conclude that, as in *Richardson*, the wrong alleged here is the negligent operation of a vessel in navigable waters. Because one of the traditional goals of admiralty jurisdiction is to ensure adherence to uniform "Rules of the Road" in the operation of boats, *see Richardson*, 457 U.S. at 676–77, 102 S.Ct. at 2659; *Executive Jet*, 409 U.S. at 269–70, 93 S.Ct. at 504–05, the alleged wrong has a traditional "maritime flavor" sufficient to invoke this jurisdiction. *See Owens-Illinois*, 698 F.2d at 970. The function and role of the ship and its crew were clearly maritime. The type of vehicle involved was a ship. Finally, injury was caused by contact with the ship's propeller and resulted from allegedly negligent operation of the ship. That decedent was swimming does not vitiate the traditional maritime nature of Paradise's wrong. *See Medina v. Perez*, 733 F.2d 170 (1st Cir. 1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 778, 83 L.Ed.2d 774 (1985).[6] We conclude that there existed here a sufficient relationship to traditional maritime activity to support admiralty jurisdiction.

## II. *Staying the State Court Proceedings*

■ The decision to grant a stay or injunction is normally reviewed for abuse of discretion. *SEC v. Carter Hawley Hale Stores, Inc.*, 760 F.2d 945, 947 (9th Cir. 1985). The threshold issue here is whether 46 U.S.C. § 187 deprives a district court of power to stay state proceedings against a ship's master, officers, or crew pending disposition of a limitation proceeding brought by the owners. Because this question is one of statutory interpretation, *de*

cuit appears to have adopted an almost *per se* rule that admiralty jurisdiction lies when the wrong involved is negligent navigation of a vessel on navigable water. *See Medina*, 733 F.2d at 171. We need not decide the outer limits of admiralty jurisdiction here; we conclude simply that this case is within the district court's jurisdiction under 28 U.S.C. § 1333.

*novo* review is appropriate. *See Southeast Alaska Conservation Council, Inc. v. Watson,* 697 F.2d 1305, 1309 (9th Cir. 1983).

As we have said, the Act permits a shipowner not personally at fault to limit his liability to his interest in his ship. Its purpose is to encourage shipbuilding, to promote investment in ships and employment of ships in commerce, and to place American shipping interests on an equal footing with that of other maritime nations. *See generally* 3 A. Jenner, B. Chase & J. Loo, *Benedict on Admiralty* §§ 6–7, at 1–42 to 1–47 (7th ed. 1985); 2 M. Norris, *The Law of Seamen* § 30:47, at 538–40 (4th ed. 1985).

The Act provides for all claims against an owner to be aggregated and decided at one time under a single set of substantive and procedural rules, thereby avoiding inconsistent results and repetitive litigation. *See Maryland Casualty Co. v. Cushing,* 347 U.S. 409, 414–16, 74 S.Ct. 608, 610–12, 98 L.Ed. 806 (1954) (plurality opinion). This objective is especially important where there are multiple claims, which aggregate to more than the limitation fund; the *concursus* before the admiralty court is designed in part to marshall available assets and to set priorities among the various claims. *S & E Shipping Corp. v. Chesapeake & Ohio Railway, Co.,* 678 F.2d 636, 642 (6th Cir. 1982). Limitation actions are equitable proceedings in which courts must consider "the rights of all claimants in addition to ... the rights of the insureds and the insurors." *New York Marine Managers v. Helena Marine Service,* 758 F.2d 313, 316 (8th Cir.) (per curiam), *cert. denied,* —— U.S. ——, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985).

Procedurally, limitation actions brought under the Act are governed by Supplemental Rules for Certain Admiralty and Maritime Claims, Rule F. Once an owner, who is subject to a claim against his ship, files a limitation complaint and posts appropriate security, he is generally entitled to an injunction enjoining "the further prosecution of any action or proceeding against the [owner] or his property with respect to any claim subject to limitation in the action." Rule F(3). This provision applies to both state and federal proceedings. Indeed, an admiralty court is generally acknowledged to possess broad injunctive power to ensure the "orderly and effective operation of the Limitation Act." *Olympic Towing Corp. v. Nebel Towing Co.,* 419 F.2d 230, 235 (5th Cir. 1969), *cert. denied,* 397 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396 (1970), *overruled on other grounds, Crown Zellerbach Corp. v. Ingram Industries, Inc.,* 783 F.2d 1296 (5th Cir. 1986) (en banc); *accord Guillot v. Cenac Towing Co.,* 366 F.2d 898, 904–07 (5th Cir. 1966).

We have recognized, however, that an injunction against actions outside of the limitation proceeding may deprive a victim of a jury trial to which he or she is otherwise entitled. *Newton v. Shipman,* 718 F.2d 959, 962 (9th Cir. 1983). We have accordingly held that a victim's choice of forum will not be disturbed by a limitation proceeding when there is only one claimant, or when the aggregated claims total less than the limitation fund. *Id.; accord S & E Shipping,* 678 F.2d at 643. In these situations, permitting a claimant to proceed against the owner outside of the limitation action cannot work to the prejudice of the owner or of other claimants.

Claimants here argue that they have a much broader right to pursue their state court action without interruption. They contend that 46 U.S.C. § 187 by its terms flatly prohibits the stay of a state court proceeding against the captain, officers or crew of a ship. The question is for us one of first impression.

■ Paradise does not contest claimants' right ultimately to pursue the captain in state court, and the injunction does not "take away" this remedy. The injunction does, however, delay the state court remedy and possibly subjects it to the preclusion of some issues by reason of the intervening admiralty litigation. Claimants contend that the stay consequently does "affect the remedy ... against the master" within the meaning of the express prohibition of sec-

tion 187. Although this argument has considerable literal appeal, we conclude that it is not a proper construction of section 187, when that statute is considered in relation to the entire Limitation of Liability Act.

A major purpose of the Act is to permit the shipowner to retain the benefit of his insurance. The Supreme Court established this proposition in *Maryland Casualty Co. v. Cushing*, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954). In that case, Justice Frankfurter, speaking for a plurality of four, stated that a direct action against insurers in state court could not be permitted to proceed prior to limitation proceedings because the effect would be that the "shipowner and charterer would then have to face whatever claims may be presented stripped of their insurance protection." *Id.* 347 U.S. at 418, 74 S.Ct. at 613. Justice Clark, joining in the judgment, stated that Congress intended by the Act to permit shipowners to indemnify themselves by insurance. *Id.* at 423–24, 74 S.Ct. at 615–16 (Clark, J., concurring). The four dissenters vigorously disputed this view, *id.* at 432–37, 74 S.Ct. at 620–22 (Black, J., dissenting), but they did not prevail. *Cushing* therefore establishes that "[t]he reason for requiring the limitation proceeding to be completed first is to permit the vessel owner to receive the benefit of his insurance." *Olympic Towing*, 419 F.2d at 235 n. 17.

This major purpose of the Act could be frustrated if claimants' action against the captain here were not stayed. Claimants seek in excess of $23 million in damages. Other claimants in the limitation proceeding have asserted more than $1.2 million in claims. The value of the ship is stated to be $625,000. Claimants in opposing the stay in district court submitted an affidavit that the shipowner had liability insurance of at least $3 million, which covered the captain as a named insured. In their brief in this court, claimants state that there may be as much as $9 million in insurance. That figure is still far short of claimants' claim. If claimants successfully pursued their state court remedy prior to the limitation proceeding, the danger of depletion of the insurance coverage would clearly exist.

The result would be to deprive the shipowner of insurance protection in the limitation proceeding. When that danger exists, the district court is not precluded by section 187 from staying the state court action against the captain. To read section 187 otherwise would frustrate a major congressional purpose underlying the Limitation of Liability Act.

As we observed, the Act is also designed to aggregate all claims against a shipowner so that they may be decided at one time under substantive and procedural rules of admiralty law. *See Cushing*, 347 U.S. at 414–16, 74 S.Ct. at 610–12. If claimants are permitted to proceed with their state court action prior to the limitation proceeding, there is a possibility that the state litigation will have some preclusive effect on issues in the limitation proceeding. We agree with the district court that the result would be to frustrate this additional purpose of the Act and to relegate the limitation proceeding from its intended central role to a secondary position. Again, we cannot read section 187 in isolation from the rest of the Act. We must construe the entire statute in a manner that best promotes each of Congress' goals.

While it has never faced the factual situation before us, the Fifth Circuit has recognized the need for flexibility in interpreting section 187. *See Olympic Towing Corp.*, 419 F.2d at 235; *cf. Guillot*, 366 F.2d at 904–09 (shipowner's corporate officers). Like *Cushing*, these cases involved potential conflicts between the Act and the Louisiana direct action statute. The various claimants argued that they should be allowed to proceed against insurers directly in separate actions without having to await the outcome of the limitation proceedings. The court, recognizing the potential conflicts between the statutes, found that the best resolution was to stay the direct action against the insurers until the limitation action was completed. In that way, the state legislature's intent in enacting the direct action statute could be preserved from Supremacy Clause attack, while the "valuable right" to limit owner liability, *Guillot*, 366

F.2d at 907, is likewise preserved. *See Cushing*, 347 U.S. at 423–27, 74 S.Ct. at 615–17 (Clark, J., concurring); *Olympic Towing*, 419 F.2d at 234–35; *Guillot*, 366 F.2d at 905.

This compromise approach was employed by the district court in *In re Spanier Marine Corp.*, 1983 A.M.C. 2441, 2442–43 (E.D.La.1983), a case factually similar to the case at bar. The *Spanier* court stayed an action against a ship's captain in state court pending outcome of the limitation action. No direct action statute was involved. Like the district court here, the court found that permitting the state action to continue raised the spectre of collateral estoppel problems and depletion of the limitation fund to the detriment of other claimants.[7]

We conclude, therefore, that it is sometimes inconsistent with the purposes of the Act to permit some limitation-action claimants to proceed in state court against a ship's captain and crew in advance of an equitable division of the limitation fund among all potential claimants. We hold that in such cases, a district court has discretion to stay the state action or otherwise to shape the limitation proceedings in a manner that promotes the purposes of the Act.[8]

■ Having concluded that the district court was empowered to grant a stay, we find that many of the same considerations support the district court's exercise of its discretion in this particular case. Permitting claimants here to proceed independently in state court before conclusion of the limitation action could work to the detriment of other injured parties and the shipowners through operation of collateral estoppel and depletion of the limitation fund. The district court's approach was a reasonable compromise between the competing goals of preserving the state forum for a jury adjudication of some maritime claims and the federal policy of limiting owner liability. There was no abuse of discretion.

AFFIRMED.

FERGUSON, Circuit Judge, concurring in part and dissenting in part:

I agree that admiralty jurisdiction exists in this action. I would vacate the district court's stay of the state court action, however, because the stay vitiates the purposes of 46 U.S.C. § 187. Furthermore, the equities in this case weigh against creating an exception to the Act.

I.

The Shipowners Limitation of Liability Act of 1851, 46 U.S.C. §§ 181–196 ("Act"), applies when a shipowner receives notice of claims against it based on tortious acts of the ship's crew of which the owner did not know and should not have known. In such a case, the owner may petition the federal court to limit the amount of its liability to the value of the vessel involved. The statute does not address the merits of any action establishing liability; it only limits the amount of the owner's liability and allows the court to stay further proceed-

---

7. Claimants rely on the district court decision in *In re Brent Towing Co.*, 414 F.Supp. 131 (N.D. Fla.1975). We do not consider that case helpful. In *Brent Towing*, the court enjoined an action against the vessel's owners outside of the limitation proceeding. At the same time, the court, without analysis, stated that nothing in its order "is to be construed as precluding separate suits against the masters, officers and crew ..." of the ship. *Id.* at 133. Unfortunately, the decision simply does not discuss whether any separate actions could be *stayed* pending resolution of the limitation proceeding.

8. Some courts and commentators have criticized the Act as constituting an anachronism in this day of insurance. *See, e.g., Baldassano v. Larsen*, 580 F.Supp. 415, 418 (D.Minn.1984); G. Gilmore & C. Black, *The Law of Admiralty* §§ 10–4 to 10–4(a), at 821–23 (2d ed. 1975). Because of this hostility to the Act, claimants urge the court to construe Section 187 as broadly as possible. An excellent argument can be made that the Act is outdated and should be repealed. That contention, however, is for Congress, not this court, to address. We must accept the Act and its purpose of limiting liability; the question is whether the proper effectuation of that purpose necessitates or permits a stay of claimants' action against the captain in state court despite the strictures of section 187.

ings against the owner with respect to any claims subject to the limitation statute.

The Act contemplates only stays of litigation against the owner. This stay is not within the scope of the Act because it stays an action against the vessel's captain. Because the Act's language refers only to litigation against the owner, and not to actions against the captain, I would vacate it.

The majority admits that this argument has "considerable literal appeal." Maj. op. at 762. The majority also admits that Rule F(3) states only that it permits enjoining proceedings against the owner. Maj. op. at 761. Thus, I fail to see how the majority reaches the conclusion that the stay does not violate the statute. The majority applies rules of statutory construction that are appropriate only if a statute is ambiguous. *Mountain States Telephone & Telegraph Co. v. Pueblo of Santa Ana,* — U.S. —, 105 S.Ct. 2587, 2595, 86 L.Ed.2d 168 (1985). Because the Act is clear and unambiguous, the majority should follow its terms.

### II.

I also disagree with the majority's conclusion that this stay furthers the Act's underlying purposes. The circumstances here do not affect the first three purposes cited by the majority: to encourage shipbuilding, to promote investment in and use of ships, and to place American shipping interests on an equal footing with other maritime nations, Maj. op. at 761. Investing in and using ships rather than other modes of transportation are not affected by a tour boat in Pearl Harbor. Further, a small tour boat used only in Pearl Harbor does not affect international shipping. Finally, if a stay of litigation involving a small tour boat can be said to further the Act's purposes, I am not sure where to draw the line. At a touring sailboat? An outrigger canoe rented from the Hilton Hotel on Waikiki Beach?

The other purpose cited by the majority, protection of the owner's insurance, Maj. op. at 761–62, does not exist for any state except Louisiana, which allows actions directly against insurance companies. The majority's reliance on *Maryland Casualty Co. v. Cushing,* 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954), and circuit court cases involving Louisiana law, Maj. op. at 762–63, is therefore unpersuasive. The only reason for the anomalous result in Louisiana cases is that, in that state, a plaintiff directly sues the insurer, so that there will never be a lawsuit against an insured owner. The Limitation Act did not contemplate the direct-action situation, so that such an exception is justified for that narrow purpose. That is not the case here. *See In re Brent Towing Co.,* 414 F.Supp. 131, 133 (N.D.Fla.1975) ("The claimants need no permission of the court to proceed against [the masters, officers, and crew].").

Further, even if insurance protection were a general purpose of the Act, the stay here would not further such a purpose. If a judgment against the captain deprives the owner of some insurance protection, any ensuing dispute should be between the owner and the captain. The owner chose to share an insurance policy with the captain; the plaintiff should not have to pay for such a decision. Also, the existence or amount of insurance is irrelevant to the specific issues on this appeal; we do not even know if insurance covers this occurence, or what the policy limits are. Finally, it is odd that the wish to protect an underinsured owner controls our decision. I have never heard of too little insurance being the basis for a court decision.

### III.

Even if I agreed with the majority that some cases might justify exceptions to the statute, no such equities exist here. In fact, the equities involved weigh against the stay.

First, the principles of federalism caution against prohibiting this type of case from proceeding in state court before any liability has been established. Section 187, which instructs federal courts not to enjoin state court actions against parties other than the owner, seems to me to "reflect the

fundamental principle of comity between federal courts and state governments that is essential to 'Our Federalism.'" *Fair Assessment in Real Estate Association v. McNary,* 454 U.S. 100, 103, 102 S.Ct. 177, 179, 70 L.Ed.2d 271 (1981). Although *McNary* dealt with state taxes,

> [t]he principle of comity has been recognized and relied upon by this Court in several recent cases dealing with matters other than state taxes. Its fullest articulation was given in the now familiar language of *Younger v. Harris,* 401 U.S. 37 [91 S.Ct. 746, 27 L.Ed.2d 669] (1971)....
>
> > "[T]he concept [of comity] [represents] a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States. It should never be forgotten that this slogan, 'Our Federalism,' born in the early struggling days of our Union of States, occupies a highly important place in our Nation's history and its future." *Id.* [401 U.S.] at 44–45 [91 S.Ct. at 750–51].

454 U.S. at 111–12, 102 S.Ct. at 183–84.

Second, the majority declares that the stay merely "delays" the state action. However, mere "delay" can have substantial effects on the state litigation. In this case, for example, the captain of the vessel died after the stay issued. Given the breadth of this stay, the plaintiffs would have been unable to depose the captain had they known of his failing health: such "proceeding" with the case would violate the stay. As a result of the "mere delay," the plaintiff lost valuable testimony.

## IV.

The Act prohibits the district court's stay and no equities exist to find an exception to the Act. I would vacate the stay.